# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 21, 2010        Decided March 8, 2011

No. 09-5359

EQUAL RIGHTS CENTER,
APPELLANT

v.

POST PROPERTIES, INC. *ET AL.*,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-01991)

———

*John P. Relman* argued the cause for the appellant. *Stephen M. Dane*, *Douglas W. Baruch* and *Katherine A. Raimondo* were on brief.

*Samuel R. Bagenstos*, Principal Deputy Assistant Attorney General, United States Department of Justice, and *Dennis J. Dimsey* and *Lisa J. Stark*, Attorneys, United States Department of Justice, were on brief for *amicus curiae* United States of America in support of the appellant.

*Virginia A. Seitz* and *C. Frederick Beckner III* were on brief for *amici curiae* AARP *et al.* in support of the appellant.

*Lynn E. Calkins* argued the cause for the appellees. *Christopher B. Hanback* and *Rafe Petersen* were on brief.

*Felicia K. Watson* was on brief for *amicus curiae* National Association of Home Builders in support of the appellees.

Before: GINSBURG, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* ROGERS.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In November 2006, the Equal Rights Center (ERC), an organization interested in, among other things, fair housing, sued Post Properties, Inc. (Post), alleging that Post "designed, constructed, and operated its [apartment] complexes in a manner making them inaccessible to persons with disabilities in violation of the Fair Housing Act" (FHA), as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601-3631, and Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12181-12189. *Equal Rights Ctr. v. Post Props., Inc.*, 657 F. Supp. 2d 197, 198 (D.D.C. 2009) (citing Compl. ¶ 2). The ERC appeals from the district court's grant of summary judgment to Post[1] on the ground that it lacked standing to bring its suit because it failed to demonstrate an injury in fact. We agree that the ERC failed to demonstrate that its injury was actual or imminent at the time it filed suit; at the same time, however, we disagree with the district court's formulation of the showing an organizational plaintiff must make to establish an injury in fact. Accordingly, we affirm the district court's judgment while setting forth the correct formulation by which to assess an organizational plaintiff's standing *vel non*.

---

[1] The ERC also sued Post Apartment Homes, LP and Post GP Holdings, Inc., both of which are affiliates of Post Properties, Inc. We refer to the defendants-appellees collectively as Post.

I.

To promote fair housing, the ERC provides counseling and education services to individuals seeking housing. In addition it sponsors education and training seminars for individuals involved in the real estate industry, including developers, and for fair housing organizations. Post has constructed and manages nearly sixty apartment communities with over 20,000 apartment units located in five states and the District of Columbia. In 2004 and 2005, after receiving complaints from national and local disability groups about the construction and accessibility of new multi-family housing units, the ERC began an investigation of several builders, including Post. The ERC claimed its investigation of Post "required the engagement of testers to inspect 27 Post developments across the country" and that "the ERC had to increase its own staff expertise in the accessibility requirements [of the FHA and the ADA], and provide[] both a basic and a specialized training to testers who were to take part in the investigation." Appellant's Br. 15; *see also* Compl. ¶¶ 17-26. In November 2006, the ERC filed a two-count complaint against Post seeking "to enjoin and remedy ongoing and systematic violations of" the FHA as well as the ADA. Compl. ¶ 2. The ERC alleged Post's statutory violations "directly and substantially injured" the ERC by "frustrat[ing] . . . its mission to eradicate discrimination in housing, and in carrying out the programs and services that it provides" and by "forc[ing] the ERC to divert significant and scarce resources to identify, investigate, and counteract Post's" alleged discriminatory practices. Compl. ¶¶ 43-44. In January 2007, Post moved to dismiss and for partial summary judgment arguing, *inter alia*, that the ERC lacked standing. The district court denied both motions in June 2007 and discovery ensued. In December 2008, Post moved for summary judgment, again arguing, *inter alia*, that the ERC lacked standing. The district court concluded that, because the ERC's alleged injury stemmed from its own

decision to investigate and litigate against Post, its injury did not confer standing. *Equal Rights Ctr.*, 657 F. Supp. 2d at 199-201. Accordingly, the court granted Post's motion for summary judgment. *Id.* The ERC timely appealed.

II.

We review standing de novo. *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009). A plaintiff's standing to sue under a statute ordinarily includes both constitutional and prudential components. No prudential standing inquiry is necessary for the ERC's FHA claim, however, "because Congress intended standing under the Fair Housing Act to extend to the full limits of Article III." *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir.) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)), *cert. denied*, 498 U.S. 980 (1990). "We therefore consider only core Article III standing." *Id.* An organization like the ERC can assert standing on its own behalf, on behalf of its members or both. *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). The ERC asserted organizational standing only, which requires it, like an individual plaintiff, to show "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Spann*, 899 F.2d at 27. To accomplish this, the ERC must point to a "concrete and demonstrable injury to [its] activities"; a mere "setback" to its "abstract social interests" is not sufficient. *Id.* (alteration in original) (internal quotation marks omitted). An organization's expenditure of resources on a lawsuit does not constitute an injury in fact sufficient to establish standing. *Id.* Otherwise, the very act of bringing a case would confer standing "and Article III would present no real limitation." *Id.* The United States Supreme Court has made clear, however, that if the defendant's allegedly wrongful action prompts an organization to "increase[]

the resources [it] must devote to programs independent of its suit" against the defendant, the organization has shown an injury in fact. *Id.* (citing *Havens*, 455 U.S. at 379). In *Havens*, an organization promoting equal housing alleged that the defendant real estate company's discriminatory practice of "steering" away black renters "had frustrated the organization's counseling and referral services, with a consequent drain on resources," 455 U.S. at 369, because it forced the organization "to devote significant resources to identify and counteract the . . . racially discriminatory steering practices." *Id.* at 379 (internal quotation marks omitted). The Supreme Court concluded that the organization's allegations, if proven, constituted a sufficient injury in fact based on the defendant company's having "perceptibly impaired" the organization's ability to provide counseling and referral services. Accordingly, the Court affirmed the Fourth Circuit's reversal of the district court's dismissal for lack of standing. *Id.* at 378-79.

Addressing the issue ourselves in *Spann*, we held that two organizations promoting fair housing had standing to sue a real estate company, its wholly-owned subsidiary and an advertising agency for running allegedly discriminatory advertisements. 899 F.2d at 25-31. The plaintiff organizations claimed the advertisements required them to expend additional resources to educate the "real estate industry and the public that racial preference in housing is indeed illegal." *Id.* at 27. They alleged the advertisements interfered with their "efforts and programs intended to bring about equality of opportunity for minorities and others in housing" and required them "to devote scarce resources to identify and counteract [the] defendants' advertising." *Id.* at 28 (internal quotation marks omitted). They further alleged that the defendants' advertising reinforced stereotypes of segregated housing and decreased the effectiveness of their efforts to educate the real estate industry and the public about anti-discrimination laws, which in turn

required the plaintiff organizations to increase their educational efforts "to counteract the influence of [the] defendants' discriminatory ads." *Id.* (internal quotation marks omitted). The plaintiff organizations further claimed the challenged advertising adversely affected their "real estate testing program" because it discouraged black buyers and renters from seeking housing through the defendant companies and required the plaintiff organizations "to broaden the scope of [their] efforts in order to reach all forms of discriminatory housing practices." *Id.* (alteration in original) (internal quotation marks omitted). We agreed that "increased education and counseling could plausibly be required . . . to identify and inform minorities, steered away from [the] defendants' complexes by the challenged ads, that [the] defendants' housing is by law open to all." *Id.* at 28-29.

More recently, we concluded that an organization promoting equal employment had standing to sue an employment agency for racial discrimination in hiring because the alleged discrimination "might increase the number of people in need of counseling" and "may have reduced the effectiveness of any given level of [the organization's] outreach efforts." *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994). If so, the defendant's actions "perceptibly impaired" the plaintiff organization's programs by making its "overall task more difficult." *Id.* While we upheld the plaintiff organization's standing, we placed an important limitation on what types of expenditures are fairly traceable to a defendant's action so as to support standing. The plaintiff organization alleged that it had discovered the defendant's alleged racially discriminatory hiring practices by "testing" the defendant. The organization twice sent white and black applicants "equipped with fake credentials intended to be comparable" to seek employment through the defendant company on the same day. *Id.* at 1270. On both days, the white applicant was given a job referral and the black applicant was

not. *Id.* We "explicitly reject[ed] the . . . suggestion that the mere expense of testing [the defendant] constitutes 'injury in fact' fairly traceable to [the defendant]." *Id.* at 1276. We explained that while a plaintiff organization's diversion of resources in order to "test" a defendant might harm its other programs, the injury was "self-inflicted" as a result of the organization's "own budgetary choices." *Id.* We concluded the organization could not claim to have been injured by the defendant simply because it chose to spend its money testing the defendant rather than on other programs. *Id.* at 1277; *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." (quoted in parenthetical, quoted citation omitted)).

From our precedent, the district court erroneously concluded that the ERC could not establish standing because it "*chose* to redirect its resources to investigate Post's allegedly discriminatory practices." *Equal Rights Ctr.*, 657 F. Supp. 2d at 201 (emphasis in original); *see also id.* ("ERC still needs to establish that the injuries it suffered were *not* due to a self-inflicted diversion of resources." (emphasis in original)). That the ERC voluntarily, or "willful[ly]," *id.* at 200, diverts its resources, however, does not automatically mean that it cannot suffer an injury sufficient to confer standing. In both *BMC* and *Spann*, the plaintiff organizations chose to redirect their resources to counteract the effects of the defendants' allegedly unlawful acts; they could have chosen instead not to respond. In neither case did our standing analysis depend on the voluntariness or involuntariness of the plaintiffs' expenditures. Instead, we focused on whether they undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged discrimination rather than in anticipation of litigation.

Thus, in *Spann* we held that the plaintiff organization's expenditures on education and counseling programs designed to educate the public about anti-discrimination laws and to counteract the effects of the defendants' allegedly discriminatory advertising sufficiently alleged an injury in fact fairly traceable to the defendants' alleged conduct. 899 F.2d at 27-29. At the same time, we explained that litigation expenses cannot establish standing. *Id.* at 27. In *BMC* we held that, because the defendant's alleged discrimination "might increase the number of people in need of counseling" and might "reduce[] the effectiveness of any given level of outreach efforts," the plaintiff organization's expenditures on education and counseling programs designed to counteract those effects sufficiently alleged an injury in fact fairly traceable to the defendant's alleged conduct. 28 F.3d at 1276. We nonetheless explained that the plaintiff organization's testing of the defendant would not establish the plaintiff's standing under *Havens* because *Havens* described the injury there as one to the plaintiff's "noneconomic interest in encouraging open housing."[2] *Id.* at 1277 (quoting *Havens*, 455 U.S. at 379 n.20). Instead of focusing entirely on the voluntariness of the ERC's diversion of resources, therefore, the district court should have asked, first, whether Post's alleged discriminatory conduct injured the ERC's interest in promoting fair housing and, second, whether the ERC used its resources to counteract that harm. While the diversion of resources to litigation or investigation in anticipation of

---

[2] In *BMC*, disagreeing with the Seventh Circuit's reading of *Havens*, we made clear that *Havens*'s "drain on the organization's resources" language did not form the basis of the plaintiff organization's standing. 28 F.3d at 1277. Instead, we explained, the "drain . . . sprang from" the organization's injury to its interest in promoting open housing, an interest, we concluded, "apart from [its] efforts at increasing legal pressure on civil-rights violators." *Id.*

litigation does not constitute an injury in fact sufficient to support standing, the ERC's alleged diversion of resources to programs designed to counteract the injury to its interest in promoting fair housing could constitute such an injury. *See BMC*, 28 F.3d at 1276-77. Our precedent thus imposes a less demanding test of an organizational plaintiff's standing than the one applied by the district court.[3]

To establish its standing, the ERC relies almost entirely on two documents it produced after the close of discovery—an August 1, 2008 document that purports to calculate the ERC's "frustration of mission damages" and a February 20, 2009 declaration of Donald Kahl, the ERC's former chief operating officer and current executive director, that describes actions the ERC took in response to Post's alleged illegal conduct.[4] *See*

---

[3] We note that the burden imposed on a plaintiff at the pleading stage is not onerous. That burden increases, however, as the case proceeds. Whereas "[a]t the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice,' and the court 'presum[es] that general allegations embrace the specific facts that are necessary to support the claim,' " at the summary judgment stage " 'the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," . . . which for purposes of the summary judgment motion will be taken to be true.' " *Sierra Club v. EPA*, 292 F.3d 895, 898-99 (D.C. Cir. 2002) (ellipsis and second alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e))). Here, we are reviewing a motion for summary judgment filed after the close of discovery. Accordingly, the ERC can no longer rest on "mere allegations" but must set forth "specific facts" establishing its injury in fact.

[4] The "frustration of mission damages" document sets forth a "preliminary calculation of frustration of mission damages total[ing] approximately $9,195,920.00." Kahl Decl. Ex. A. The calculation has

Kahl Decl. & Ex. A. Accepting the "frustration of mission damages" document and Kahl's declaration as accurate, as we must at the summary judgment stage, *see Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994),[5] we find them insufficient to establish standing because they do not indicate when the ERC undertook the specified activities. To satisfy Article III, an injury in fact must be both "concrete and particularized" and "actual or imminent" at the time the plaintiff files suit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Worth v. Jackson*, 451 F.3d 854, 860 (D.C. Cir. 2006) ("[T]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989))). The ERC produced the "frustration of mission damages" document more than twenty months after it filed its complaint and it submitted Kahl's declaration over six months after that. Despite the substantial passage of time from the filing of its lawsuit, the ERC does not spell out when it engaged in the specified activities. The ambiguity is compounded by Kahl's declaration, which suggests that the ERC has only begun to implement counteraction programs and has yet to complete others. *See* Kahl Decl. ¶¶ 29-34. Although we do not foreclose the possibility that such costs could suffice to show injury in fact, as presented by the ERC

---

five components: accessibility-related counseling and advocacy, accessibility testing and monitoring, accessibility education and outreach, advertising and audits/reports. Activities identified in the Kahl declaration include increased educational and counseling efforts, "an accessibility advertising campaign," "designing a housing accessibility self-advocacy toolkit" and designing "fact sheets for accessibility guidelines for developers." Kahl Decl. ¶¶ 23, 28-34.

[5] Because we conclude the ERC does not have standing on the full record, Post's motion to strike Kahl's declaration is, as the district court held, moot.

they do not. In short, neither document sets forth specific facts demonstrating the ERC suffered an injury in fact that was actual or imminent at the time it filed suit.[6]

Nor does the ERC identify any other record evidence that demonstrates that it suffered an injury in fact near to the date of the complaint. In fact, the record suggests that the only expenses the ERC incurred that could be described as "actual or imminent" in relation to the filing of the complaint are investigation and litigation expenses. For instance, Bruce Kahn, the ERC's former executive director, stated in his deposition that the ERC had diverted its resources to the investigation of, and litigation against, Post, which prevented it from using those resources for other purposes. Kahn Dep. 38:12-44:2, Oct. 3, 2007. Two other ERC employees—Arlene Corbin Lewis, the communications and outreach manager, and Veralee Liban, also a former executive director—stated in depositions that they were unaware of any way in which Post had frustrated the ERC's mission or caused the ERC to divert resources. Lewis Dep. 101:8-17, Apr. 4, 2008; Liban Dep. 259:18-260:13, Apr. 18, 2008. Kahl, in his deposition, was similarly unable to identify any injury suffered by the ERC other than the diversion of its resources "to researching, investigating, testing, and now litigating with Post Properties with respect to its discriminatory actions." Kahl Dep. 220:18-221:15, Apr. 23, 2008. Like the testing in *BMC*, these alleged expenditures more closely resemble "efforts at increasing legal pressure on" Post than they do efforts to counteract Post's alleged injury to the ERC's

---

[6] In fact, in December 2008—more than two years after the ERC filed its complaint—counsel for the ERC stated that at least some, and perhaps all, of the expenses listed in the "frustration of mission damages" document had not yet been incurred. Tr. of Oral Arg. on Defs.' Mot. in Limine to Exclude Evidence at 23-24, *Equal Rights Ctr. v. Post*, No. 1:06-cv-01991 (D.D.C. Mar. 17, 2009).

interest in promoting fair housing. *BMC*, 28 F.3d at 1277. The ERC's diversion of resources to the investigation of, and resulting legal challenge to, Post's alleged discriminatory practices is a "self-inflicted" injury, not one attributable to Post. *See id.* at 1276. Accordingly, the ERC has failed to demonstrate that at the time it began this litigation it had suffered an injury in fact sufficient to support standing. *See Newman-Green*, 490 U.S. at 830 (jurisdiction ordinarily determined as of time complaint is filed); *Doctors Nursing & Rehab. Ctr. v. Sebelius*, 613 F.3d 672, 677 (7th Cir. 2010) ("[T]he general rule is that we analyze jurisdiction based on the events at the time the case is brought." (internal quotation marks and brackets omitted)).[7]

For the foregoing reasons, we affirm the district court's grant of summary judgment to Post.

*So ordered.*

---

[7] Because we conclude the ERC lacks constitutional standing, we need not address its prudential standing on its separate claim under the ADA.

ROGERS, *Circuit Judge*, concurring: I concur in affirming the grant of summary judgment to Post Properties, Inc. and its affiliates ("Post") for lack of constitutional standing by the Equal Rights Center ("ERC"). At the summary judgment stage, after the close of discovery, the ERC could not rely on mere allegations of injury and it failed to "set forth by affidavit or other evidence specific facts" establishing that the ERC had suffered a legally cognizable injury in fact at the time it filed suit against Post. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks omitted) (quoting FED. R. CIV. P. 56(e)). Such allegations were sufficient in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and *Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C. Cir.), *cert. denied*, 498 U.S. 980 (1990), because the proceedings were at the preliminary motion to dismiss stage, and had not advanced to summary judgment. *See Lujan*, 504 U.S. at 561; *Sierra Club v. EPA*, 292 F.3d 895, 898–99 (D.C. Cir. 2002). The documentary submissions by the ERC either did not identify when expenditures were incurred or describe activities other than those undertaken in pursuit of suing Post. *See* Op. at 11–13.

Nonetheless, in my view, *Fair Employment Council of Greater Washington v. BMC Marketing Corp.*, 28 F.3d 1268 (D.C. Cir. 1994), went too far in suggesting that "testing" expenditures are necessarily self-inflicted injuries that cannot suffice to show injury in fact for purposes of constitutional standing, *id.* at 1276, and in holding that the deflection of an organization's time and money from its counseling programs "to increase legal pressure" directed at discrimination are insufficient, *id.* at 1276–77. The court rejected as a matter of logic, *see id.* at 1277, the Seventh Circuit's approach in *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990), which acknowledged the practical realities of how organizations work to combat discrimination. The Seventh Circuit held that even when a fair housing organization's other activities had not

been impaired by the defendant's discriminatory practices, "the only injury which need be shown . . . is deflection of the agency's time and money from counseling to legal efforts directed against discrimination." *Id*. at 1526. This standard, the court explained, was consistent with *Havens* because "[t]hese are opportunity costs of discrimination, since although the counseling is not impaired directly there would be more of it were it not for the defendant's discrimination." *Id.* at 1526.

Be that as it may, *BMC* is binding in this circuit and, absent en banc review by this court or a Supreme Court decision on point, organizations must prepare their documentary showings at the post-discovery summary judgment stage to avoid the effects of the limitation established by *BMC* in "reject[ing] the . . . suggestion that the mere expense of [']testing['] [the defendant] constitutes 'injury in fact' fairly traceable to [the defendant's] conduct." 28 F.3d at 1276. Today, the court reins in *BMC*'s reach by identifying the questions a district court must ask, *see* Op. at 10, and re-emphasizing that "the ERC's alleged diversion of resources to programs designed to counteract the injury to its interest in promoting fair housing could constitute [the requisite] injury," *id*. Such a diversion might be based on, or the result of, research, investigation, or "testing" necessary to design and implement such programs. This, in my view, is a step in the right direction.

Accordingly, I concur.