2020 IL App (1st) 192099

No. 1-19-2099

Opinion filed December 15, 2020.

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE GRASSROOTS COLLABORATIVE and RAISE YOUR HAND FOR ILLINOIS PUBLIC EDUCATION, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 2019 CH 04888 |
| | ) | |
| THE CITY OF CHICAGO, | ) ) | The Honorable Neil H. Cohen, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justice Cobbs concurred in the judgment and opinion.
Justice Pucinski dissented, with opinion.

**OPINION**

¶ 1 Plaintiffs, The Grassroots Collaborative (Grassroots) and Raise Your Hand for Illinois

Public Education (RYH), appeal from the circuit court's dismissal of their complaint against

defendant, the City of Chicago (City), under section 2-619.1 of the Code of Civil Procedure

(Code) (735 ILCS 5/2-619.1 (West 2018)) based on a lack of standing. For the reasons that

follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3      Plaintiffs alleged the following in their complaint. Plaintiffs are two nonprofit

organizations operating within Chicago and Illinois as a whole. Grassroots is composed of 11

organizations that work together to create equitable policy with the mission to "bring together

organizations across different political movements to resist the corporate interests working

against its constituents." In pursuing its goal of helping disenfranchised people, Grassroots has

worked to close corporate tax loopholes and raise the minimum wage. Additionally, Grassroots

has developed and implemented a training program for its organizations and community

members called the "People's Academy."

¶ 4      RYH is a coalition of parents and concerned citizens whose mission is to "engage,

inform, and empower parents to protect and strengthen public education for all children in

Chicago and Illinois, eliminate inequities in public schools, and work at the grassroots for the

public good that is public education." To this end, RYH engages in projects and programs "in

areas relating to equitable school funding, special education, facilities, curriculum, privatization,

standardized testing, student privacy, and democratic, accountable, and transparent school

governance."

¶ 5      Plaintiffs alleged that the City, for over 30 years, has illegally administered the Tax

Increment Financing (TIF) program under the Tax Increment Allocation Redevelopment Act

(TIF Act) (65 ILCS 5/11-74.4-1 *et seq.* (West 2018)) in a racially and ethnically discriminatory

manner. In an effort to eradicate and prevent blighted areas, municipalities can use the TIF

program to fund public and private developments in designated TIF districts. To be designated a

TIF district, the area must qualify as a blighted area, conservation area (an area at risk of

becoming blighted), industrial park conservation area, or intermodal terminal facility area, as

those terms are defined under the TIF Act. Additionally, a redevelopment plan must be created for blighted or conservation areas to be designated as TIF districts, which must include a comprehensive plan to address and eliminate the conditions that qualify them as blighted or conservation areas. Finally, a redevelopment plan cannot be adopted and a TIF district cannot be designated unless the municipality finds that the "but-for test" has been satisfied, *i.e.*, "the redevelopment project area on the whole has not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of the redevelopment plan." 65 ILCS 5/11-74.4-3(n)(J)(1) (West 2018). TIF districts are designated for periods of somewhere between 23 and 35 years, depending on the type of TIF district and whether a renewal of its designation is obtained.

¶ 6      At the time that a TIF district is created, the value of all property in that district is assessed and set as the base level equalized assessed valuation (EAV). Taxes are collected on the base level EAV as usual and distributed to the taxing bodies that would normally receive those taxes. In Chicago, the taxing bodies that receive revenue from the base level EAV include the City, Chicago Public Schools, City of Chicago Library Fund, Chicago Park District, City Colleges of Chicago, Cook County, Cook County Forest Preserve, and the Metropolitan Water Reclamation District of Greater Chicago. For the duration of the TIF district, should the value of the property in the TIF district increase, any taxes collected on that increase are separated from the taxes collected on the base level EAV and placed in a separate fund. These taxes are then used by the City to fund public projects and private developments within the TIF district or immediately adjacent TIF districts. After the expiration and dissolution of a TIF district, all taxes collected within the former TIF district are collected and distributed as usual, and any surplus funds remaining in the TIF district may be returned to the taxing bodies.

¶ 7    According to plaintiffs, over the past 30 years, the City designated areas as TIF districts that were not blighted or in danger of becoming blighted and that were already experiencing or likely to experience economic growth. These illegally designated TIF districts tended to be in predominantly white areas of the City, near other thriving and affluent neighborhoods. As a result, because those illegally designated TIF districts were likely to experience growth absent their designation as TIF districts, they captured increased tax revenue that otherwise would have gone to the general revenue fund. This resulted in the predominantly white and affluent residents of the illegally designated TIF districts to exclusively benefit from the increased tax revenue that should have benefited all City residents, including Black and Hispanic residents. Moreover, citizens outside of the illegally designated TIF district were required to pay increased taxes to compensate for any shortfall created by the siphoning of the incremental taxes that would have otherwise gone to the general revenue fund. Plaintiffs also alleged that the City's discriminatory administration of the TIF program in favor of predominantly white and affluent residents deprived predominantly Black and Hispanic areas that are blighted or at risk of becoming blighted, the opportunity to be designated TIF districts. This consequently denied the Black and Hispanic communities in those areas the economic development encouraged by the TIF program. Plaintiffs alleged that in 2017, $660 million in revenue was brought in by and directed to the City's TIF districts.

¶ 8    In their complaint, plaintiffs specifically challenged the City's creation of the Cortland and Chicago River TIF district. That district, consisting of 168 acres bounded by Webster Avenue, Clybourn Avenue, North Avenue and Elston Avenue, is surrounded by the popular neighborhoods of Logan Square, Bucktown, Wicker Park and Lincoln Park. The population within a half-mile radius of the center of the Cortland and Chicago River TIF district is nearly

80% non-Hispanic white, 12% Hispanic, and 4% Black. Historically, the land in that district had been used for manufacturing and industrial purposes. Between 1990 and 2015, however, much of the manufacturing moved out of the district.

¶ 9     In 2016, the City began developing plans to modernize the land use in the Cortland and Chicago River TIF district and to create opportunities for retail and residential development. During this time, and even in the years leading up to it, real estate developer Sterling Bay began to purchase tracts of land within the district. In July 2017, the city council passed an ordinance that repealed many of the industrial zoning laws previously imposed on the area and opened the way for mixed use development. Shortly thereafter, Sterling Bay pitched the land to Amazon for development through the use of TIF funding. Amazon declined the offer, and Sterling Bay revised its plans for redevelopment of the area. Despite public opposition to the use of TIF funding for the redevelopment of the area, on April 10, 2019, the city council passed ordinances that created the Cortland and Chicago River TIF district and also approved a redevelopment agreement that named Sterling Bay's subsidiaries as the developer.

¶ 10    Plaintiffs alleged that the Cortland and Chicago River TIF district failed the "but-for test" to be designated as a TIF district under the TIF Act, because it was reasonably anticipated to develop and grow naturally without the TIF district and redevelopment plan. This is because the Cortland and Chicago River TIF district is located between the economically growing community of Logan Square and the affluent neighborhoods of Bucktown, Lincoln Park, and Wicker Park; natural economic expansion is occurring in the district and in the surrounding areas; the value of improved land is rising at a rate higher than the rest of Chicago; and Sterling Bay bought and created redevelopment plans for large portions of the land in the district prior to the area being designated a TIF district.

¶ 11     Plaintiffs also alleged that the Cortland and Chicago River TIF district failed to satisfy the requirements to be considered a "blighted area" under the TIF Act because the City failed to consider 2018 data that would have shown, in contradiction to the City's conclusion, that the EAV values in the area were not lagging.

¶ 12     The creation of the Cortland and Chicago River TIF district, plaintiffs alleged, resulted in $1.3 billion being spent on redevelopment projects in the district when that money would have otherwise gone to the general revenue fund and been allocated across the City. In addition, residents across the City would likely have to pay greater taxes to make up for the money spent in illegally designated TIF districts, such as the Cortland and Chicago River TIF district, despite the fact that the benefits of these TIF districts would inure to the predominantly white residents of the districts.

¶ 13     Plaintiffs alleged that, as a result of the City's discriminatory administration of the TIF program and the City's designation of the Cortland and Chicago River TIF district, they have been injured. Specifically, Grassroots alleged that the City's actions resulted in Grassroots, over time, diverting resources away from its normal advocacy efforts to instead devote them to addressing the inequities created by the City's actions. According to Grassroots, if left unaddressed, these inequities would detrimentally affect Grassroots' ability to advocate for equitable development in Chicago and to resist the use of public funds to benefit corporate interests. Grassroots' efforts to reform the City's administration of the TIF program has included authoring a report on the impact of the City's use of the TIF program to invest in downtown Chicago; organizing and participating in press conferences, community meetings, and other events; introducing ordinances; and preparing members to publicly comment at city council meetings and public hearings. Grassroots alleged that the City's actions frustrated its mission to

create equitable policies that improve the lives of disenfranchised people in Chicago and caused and will continue to cause Grassroots to divert time and resources from its other programs and projects to combat the City's discriminatory administration of the TIF program and the creation of the Cortland and Chicago River TIF district.

¶ 14    Similarly, RYH alleged that the City's actions, over time, caused RYH to divert resources from its work in other areas to address the inequities resulting from the City's actions. These inequities, RYH alleged, if not addressed, would detrimentally affect RYH's ability to protect and strengthen public education for all children. RYH's efforts to combat the effects of the City's actions included organizing campaigns to advocate for the return of the TIF surplus to Chicago Public Schools and other taxing bodies; supporting parents' efforts to meet with aldermen about the TIF districts through research, data collection and analysis, and training; presenting testimony on school funding inequities and the need for TIF reform at Chicago Board of Education meetings; and educating and informing parents of Chicago Public Schools students about the impact on public education funding resulting from the creation of the Cortland and Chicago River TIF district, organized advocacy, and action steps. RYH alleged that the City's actions frustrated its mission to advocate for quality public education and eliminate inequities in public schools and has caused and will continue to cause RYH to divert time and resources from its other programs and projects to combat the City's discriminatory administration of the TIF program and the creation of the Cortland and Chicago River TIF district.

¶ 15    Ultimately, plaintiffs alleged that the City's discriminatory administration of the TIF program violated the Illinois Civil Rights Act of 2003 (740 ILCS 23/5(a)(1), (2) (West 2018) (count I)); and the TIF Act (65 ILCS 5/11-74.4-3(a), (n) (West 2018) (count II)).

¶ 16    The City moved to dismiss plaintiffs' complaint pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2018)), asserting, among other things, that plaintiffs lacked standing to maintain their action because their alleged diversion of resources was not a distinct, palpable injury to a legally cognizable interest and was not fairly traceable to the City's actions. Plaintiffs, relying on the holding of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), asserted that they had standing because their injuries consisted of the frustration of their missions and diversion of their resources to counteract that frustration.

¶ 17    Following a hearing on the matter, the circuit court concluded that plaintiffs lacked standing and, consequently, granted the City's motion to dismiss their case with prejudice. In reaching its conclusion, the court found that, because plaintiffs' expenditures of time and resources were part and parcel of their core missions and a result of plaintiffs' decision on how to allocate their resources, the diversion of resources did not constitute a distinct and palpable injury to a legally cognizable interest that was fairly traceable to the City's conduct. The court also found the decision in *Havens* inapplicable because the plaintiff organization there, unlike here, alleged that the defendant's actions impaired its ability to provide specific services to its constituents. Accordingly, the circuit court dismissed plaintiffs' case with prejudice.

¶ 18    We note that, although the circuit court's decision was based on plaintiffs' lack of standing under section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2018)), the court dismissed their case with prejudice pursuant to section 2-619.1 of the Code.

¶ 19    This appeal followed.

¶ 20                                    ANALYSIS

¶ 21    Section 2-619.1 of the Code allows the movant to combine a section 2-615 motion to dismiss (735 ILCS 5/2-615 (West 2018)) with a section 2-619 motion to dismiss (735 ILCS 5/2-

619) (West 2018)). *In re Application of County Treasurer*, 2012 IL App (1st) 101976, ¶ 28. A section 2-615 motion attacks the legal sufficiency of the nonmovants' claim whereas a section 2-619 motion admits the legal sufficiency of their claim but asserts affirmative defenses or other matters that avoid or defeat it. *Gatreaux v. DKW Enterprises, LLC*, 2011 IL App (1st) 103482, ¶ 10. We review the lower court's judgment on a section 2-619.1 motion *de novo*, and we may affirm the court's judgment on any basis in the record, regardless of whether the court relied on that basis or whether its reasoning was correct. *Id.*

¶ 22    On appeal, plaintiffs contend that the circuit court erroneously dismissed their case with prejudice because they alleged a sufficient injury based on the diversion of their resources to combat the City's discriminatory administration of the TIF program and the illegal designation of the Cortland and Chicago River TIF district, to confer standing on them. We disagree.

¶ 23    As an initial matter, we note that the parties have spent a great deal of time debating whether federal or Illinois law governs the question of plaintiffs' standing in this case. And, while the parties have correctly observed that Illinois courts tend to find federal law persuasive on the issue of standing, we are not bound to follow it. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 491 (1988). That being said, we will address relevant differences in the law as to standing on an as-needed basis below.

¶ 24    The purpose of the standing requirement is to ensure that only those parties with a real interest in the outcome of the case are able to raise issues and to preclude those who have no interest in the controversy from bringing suit. *Glisson v. City of Marion*, 188 Ill. 2d 211, 221 (1999). To have standing in a case, a plaintiff must have sustained an injury, actual or threatened, to a legally cognizable interest, and that injury must be "(1) distinct and palpable; (2) fairly traceable to the defendant's actions; and (3) substantially likely to be prevented or redressed by

the grant of the requested relief." *Id.*; see also *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) ("Art. III requires the party who invokes the court's authority to 'show he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' [citation], and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision' [citation]."); *Common Cause Indiana v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019) ("To assert standing for injunctive relief, [organizations] must show that they are under an actual or imminent threat of suffering a concrete and particularized 'injury in fact'; that this injury is fairly traceable to the defendant's conduct; and that it is likely that a favorable judicial decision will prevent or redress the injury.").

¶ 25    With that in mind, we must determine whether plaintiffs sustained a distinct and palpable injury to a legally cognizable interest that was fairly traceable to the City's actions in this case. Plaintiffs' allegations as to their claimed injuries, when boiled down, are essentially that the City's discriminatory administration of the TIF program and unlawful designation of the Cortland and Chicago River TIF district frustrated their missions by compelling them to engage in advocacy directed against the City's actions. This advocacy required them to divert resources they would have otherwise invested in other advocacy efforts directed against other practices or policies that ran counter to their missions. Plaintiffs contend this frustration of mission and diversion of resources constituted an injury sufficient to establish their standing under *Havens*. The City disagrees, as do we.

¶ 26    In *Havens*, the plaintiff organization, Housing Opportunities Made Equal (HOME), alleged that the defendant realty company engaged in racial steering, *i.e.*, turned Black applicants away from its apartments but did not do the same to white applicants. 455 U.S. at 368. HOME

further alleged that it was a nonprofit organization whose purpose was " 'to make equal opportunity in housing a reality in the Richmond[, Virginia,] Metropolitan Area.' " *Id*. To that end, HOME operated a housing counseling service and investigated and referred complaints on housing discrimination. *Id.* HOME alleged that it was injured in that Havens' racial steering practices had frustrated its counseling and referral services and, consequently, served as a drain on its resources. *Id.* at 369. Specifically, HOME alleged the following:

> "Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices." (Internal quotation marks omitted.) *Id.* at 379.

Without much discussion, the United States Supreme Court reached the following conclusion with respect to HOME's standing to bring suit against Havens:

> "If, as broadly alleged, [Havens'] steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests ***." *Id.*

¶ 27    Plaintiffs contend that, like HOME in *Havens*, they were injured because their core purposes were undermined by the City's illegal administration of the TIF program, resulting in the diversion of their resources to combat the City's actions. More specifically, plaintiffs claim that their goals could not be met when illegal TIF districts continued to siphon funds that could

- 11 -

otherwise be used to fund public schools and other vital public institutions. Even accepting these allegations as true, as we must, we do not believe that they establish plaintiffs' standing under the holding of *Havens*.

¶ 28    Although the *Havens* decision referenced HOME's use of resources to combat Havens' racial steering practices, the focus and basis of the Court's decision that HOME had standing in its own right was HOME's allegation that Havens' racial steering practices impaired its provision of its counseling and referral services. The Court's focus on the impairment of HOME's services (as opposed to the drain on its resources) is readily apparent from its discussion:

> "If, as broadly alleged, [Havens'] steering practices have perceptibly *impaired HOME's ability to provide counseling and referral services* \*\*\*, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury *to the organization's activities*—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests \*\*\*." (Emphases added.) *Id.*

Accordingly, under our reading of *Havens*, an organization is injured for purposes of standing when the provision of its services or the performance of its activities is impaired by the defendant's actions. Although the drain on or diversion of resources that may accompany that impairment might compose a portion of the organization's injury, we see no basis in *Havens* to conclude that it alone qualifies as an injury sufficient to confer standing on an organization.

¶ 29    Our conclusion in this respect is bolstered by a number of cases: *Common Cause Indiana*, 937 F.3d at 954-55 (explaining that organizations do not have standing based on work they are already performing, but rather, "[t]he question is what additional or new burdens are created by

the law the organization is challenging," and finding that "[t]he Organizations in this case have shown that Act 442's effect [(Ind. Code § 3-7-38.2-5(d)-(e) (West 2018))] on their work goes far beyond 'business as usual.' They have done so through concrete evidence showing that Act 442 is already disrupting their operations, and if it goes into effect, it will likely require them significantly to change or expand their activities."); *Lane v. Holder*, 703 F.3d 668, 674-75 (4th Cir. 2012) (noting that the *Havens* decision was based on the plaintiff's allegation that the defendant's actions impaired its ability to provide counseling and referral services, and concluding that the plaintiff organization's diversion of resources was not an injury sufficient to confer standing because "[a]lthough a diversion of resources might harm the organization by reducing the funds available for other purposes, 'it results not from any actions taken by [the defendant], but rather from the [organization's] own budgetary choices' " (quoting *Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F3d 1268, 1276 (D.C. Cir. 1994))); *Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001) (where the Better Government Association had in the past used investigators, attorneys, journalistic techniques, and litigation to expose corruption and advance government reform, its expenditure of time and money in the same manner to pursue the fraud alleged in *Plotkin* did not confer standing on it because "ordinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing"); *Animal Legal Defense Fund v. Quigg*, 932 F.2d 920, 936 (Fed. Cir. 1991) ("HFA and AVAR assert only a general interest in preventing cruelty to animals. That these appellants allege that they will expend more dollars on organizational activities and expenses [to counteract the defendants' alleged illegal actions] does not serve to distinguish them from any member of the public with a particularized conviction about

protecting animals. *** Thus, HFA and AVAR have failed to allege *any* legally cognizable injury." (Emphasis in original.)).

¶ 30    Particularly illustrative is *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015). In that case, the plaintiffs, including plaintiff Food & Water Watch, Inc. (FWW), sought to challenge regulations promulgated by the United States Department of Agriculture related to inspections of poultry intended for human consumption. *Id.* at 909-12. The circuit court, however, dismissed FWW's claims based on a lack of standing, and the appellate court affirmed that conclusion. *Id.* at 912, 921. FWW's claim of standing was based on allegations that permitting the regulations at issue to go into effect would render the time and resources it had spent combatting the regulations a waste and would require FWW to increase the time, money, and other resources spent on educating its members and the general public about the effects of the regulations and on encouraging its members and the general public to purchase their poultry from farmers' markets or directly from producers. *Id.* at 920.

¶ 31    In assessing whether these claims amounted to an injury sufficient to confer standing on FWW, the court provided a thorough discussion of the applicable principles:

"An organization must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.' [Citation.] 'The court has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised.' [Citation.] Accordingly, for FWW to establish standing in its own right, it must have 'suffered a concrete and demonstrable injury to [its] activities.' [Citation.] Making this determination is a two-part inquiry—'we ask, first, whether the agency's action or omission to act injured the [organization's] interest

and, second, whether the organization used its resources to counteract that harm.' [Citation.] ***

To allege an injury to its interest, 'an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services in order to establish injury in fact.' [Citation.] An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an 'inhibition of [the organization's] daily operations.' [Citation.] Our precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury. [Citations.] Furthermore, an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.' [Citation.]" *Id.* at 919-20.

Based on these principles, the court held that, even taking FWW's allegations as true, it failed to allege anything more than an abstract injury to its interests. More specifically, the court noted that FWW did not allege that the regulations limited FWW's ability to seek redress for violations of law or restricted the flow of information that FWW used to educate its members. Although the court acknowledged that FWW claimed that it would spend resources to educate its members and the public about the regulations, it had made no allegations indicating that its organizational activities had been perceptibly impaired in any way; thus, FWW had not alleged an injury that would give rise to organizational standing. See *id.* at 921.

¶ 32    Applying this law to the case before us, we conclude that the allegations in plaintiffs' complaint do not support their claim of standing. As discussed above, to establish an injury sufficient to confer standing, plaintiffs' ability to provide services or perform their daily

operations must be impaired. See *Havens*, 455 U.S. at 379 ("If, as broadly alleged, [Havens']
steering practices have perceptibly impaired HOME's ability to provide counseling and referral
services ***, there can be no question that the organization has suffered injury in fact."); *Food &
Water Watch, Inc.*, 808 F.3d at 919 ("To allege an injury to its interest, 'an organization must
allege that the defendant's conduct perceptibly impaired the organization's ability to provide
services in order to establish injury in fact.' [Citation.] An organization's ability to provide
services has been perceptibly impaired when the defendant's conduct causes an 'inhibition of
[the organization's] daily operations.' [Citation.]"). Plaintiffs, in contrast, have made no
allegations that they have suffered any impairment to the provision of their services or the
performance of their daily operations.

¶ 33    Instead, plaintiffs' allegations consist only of claims that the City's discriminatory
administration of the TIF program and illegal designation of the Cortland and Chicago River TIF
district caused them to divert resources from their other, usual advocacy efforts to engage in
advocacy efforts to counter the City's actions. Plaintiffs also alleged that the City's actions have
frustrated their missions and undermined their core purposes. These claims, however, do not
constitute concrete and demonstrable injuries to their activities and are, instead, only abstract
injuries to their interests that are insufficient to confer standing. *Food & Water Watch, Inc.*, 808
F.3d at 919 ("An organization must allege more than a frustration of its purpose because
frustration of an organization's objectives 'is the type of abstract concern that does not impart
standing.' [Citation.] *** Accordingly, for FWW to establish standing in its own right, it must
have 'suffered a concrete and demonstrable injury to [its] activities.' [Citation.]").

¶ 34    Plaintiffs, by their own allegations, have for years engaged in advocacy in an effort to
achieve their respective ideological goals. Thus, plaintiffs' expenditure of resources to advocate

against the City's actions, at most, simply represents a shift in the target of plaintiffs' advocacy efforts. In other words, by advocating against the City's discriminatory administration of the TIF program and illegal designation of the Cortland and Chicago River TIF district, plaintiffs are doing the same thing they did before the City engaged in its alleged misconduct—advocating against systems, practices, and policies that run counter to their missions—just with a new target.

¶ 35    We recognize that by shifting their advocacy efforts to the City's actions, plaintiffs have likely also needed to shift their resources from their previous advocacy efforts to their advocacy efforts against the City's actions. This reallocation, however, is simply part of any organization's management. Absent infinite resources, all organizations must engage in difficult decisions on how to prioritize their efforts and, accordingly, how to allocate their resources. As the social, political, legal, and economic landscapes change, these decisions must be revisited and reassessed. Plaintiffs do not have a protectable interest in their allocation of resources as it existed prior to their efforts directed against the City's actions, such that any circumstances that compel a change in the allocation of plaintiffs' resources does not necessarily constitute an injury to them.

¶ 36    Accordingly, the fact that plaintiffs reallocated their resources to counter the effects of the City's actions does not represent a palpable and distinct injury to plaintiffs, as the reallocation of resources is inherent in the operations of such organizations. See *Lane*, 703 F.3d at 674-75 (concluding that the plaintiff organization's diversion of resources was not an injury sufficient to confer standing because "[a]lthough a diversion of resources might harm the organization by reducing the funds available for other purposes, 'it results not from any actions taken by [the defendant], but rather from the [organization's] own budgetary choices' " (quoting *Fair Employment Council*, 28 F.3d at 1276)); *Plotkin*, 239 F.3d at 886 (where the Better

Government Association had in the past had used investigators, attorneys, journalistic techniques, and litigation to expose corruption and advance government reform, its expenditure of time and money in the manner to pursue the fraud alleged in *Plotkin* did not confer standing on it because "ordinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing"); *Animal Legal Defense Fund*, 932 F.2d at 936 ("HFA and AVAR assert only a general interest in preventing cruelty to animals. That these appellants allege that they will expend more dollars on organizational activities and expenses [to counteract the defendants' alleged illegal actions] does not serve to distinguish them from any member of the public with a particularized conviction about protecting animals. *** Thus, HFA and AVAR have failed to allege *any* legally cognizable injury." (Emphasis in original.)).

¶ 37    We briefly note, however, plaintiffs' argument in their brief that the lack of funding for schools and other vital public institutions due to the siphoning of tax funds by illegal TIF districts from the general tax fund, constitutes an actionable injury conferring standing on plaintiffs where it undermines their ability to achieve their goals. This argument is without merit because, even assuming the City's actions result in a substantial lack of funding to public schools and other public institutions which impact the quality of and access to public education and public services, this does not injure plaintiffs in this case. Instead, the City's actions might injure the public school teachers and students who are denied access to the services offered at other public institutions.

¶ 38    Moreover, if we were to agree that plaintiffs have standing here because the City's actions detracted from the funds plaintiffs believe necessary to realize their general missions, we would essentially be holding that organizations have standing to challenge any government action that affects the funding of the organizations' pet issue. Such a holding would effectively

open the litigation floodgates and eliminate the standing requirement give that organizational standing could be based simply on an organization's ideological disagreement with the allocation of government funds or any policy, program, or action that results in the organization's goals not being funded to the extent the organization desires. See *Valley Forge Christian College*, 454 U.S. at 483 ("[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the [standing] requirements of Art. III without draining those requirements of meaning."). This would result in courts being used to adjudicate value disputes or matters of general public concern that are better addressed by other branches of the government. See *id.* at 473, 475 (stating that the judicial process should not be used to vindicate value interests of concerned bystanders and observing that courts have refrained from adjudicating abstract questions of broad public importance that are no more than general complaints by the larger public better addressed by the legislature); see also, *e.g.*, *Glisson*, 188 Ill. 2d at 231 ("[A] party cannot gain standing merely through a self-proclaimed interest or concern about an issue, no matter how sincere."); *Lombard Historical Comm'n v. Village of Lombard*, 366 Ill. App. 3d 715, 718 (2006) (stating that a self-proclaimed concern in an issue does not vest one with standing, even if manifested by voluntary contributions).

¶ 39     Our conclusion that an organization's diversion of resources, without more, is not an injury sufficient to confer standing also resolves any concern regarding fabricated standing. If the diversion or spending of resources to counter the effects of a defendant's act or omission constitutes an injury sufficient to confer standing, then organizations could artificially create standing simply by expending some of their resources to "combat" the defendant's action, even if the organization was not otherwise injured by the defendant's action. This would, in our

opinion, completely undermine the purpose of the standing requirement by allowing those not actually injured to bring suit.

¶ 40   We recognize there are some cases that suggest a diversion of resources alone is sufficient to confer standing on an organization. See, *e.g.*, *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) ("Even if only a few suspended drivers are counseled by NYTWA in a year, there is some perceptible opportunity cost expended by the Alliance, because the expenditure of resources that could be spent on other activities 'constitutes far more than simply a setback to [NYTWA's] abstract social interests.' [Citation.]"); *Equal Rights Center v. Post Properties, Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011) ("While the diversion of resources to litigation or investigation in anticipation of litigation does not constitute an injury in fact sufficient to support standing, the ERC's alleged diversion of resources to programs designed to counteract the injury to its interest in promoting fair housing could constitute such an injury."); *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("*Havens* makes clear, however, that the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination. These are opportunity costs of discrimination, since although the counseling is not impaired directly there would be more of it were it not for the defendant's discrimination."). ¶ 41   For all the reasons explained at length above, we find that these cases misread and oversimplify the holding in *Havens* and that the better approach is to require an organization seeking standing on its own behalf to have suffered some impairment of its provision of services or performance of its activities. Because plaintiffs' complaint in this case alleged no such impairment of the provision of its services or performance of its activities, we conclude that the circuit court did not err in dismissing plaintiffs' complaint with prejudice for lack of standing.

¶ 42     To the extent our dissenting colleague believes that plaintiffs should be afforded an opportunity to allege a viable injury in an amended complaint, this issue was forfeited. In fact, plaintiffs specifically admitted at oral argument that it was "correct" that they "never asked to amend" their complaint during the lower court proceedings. And contrary to the dissent's suggestion that plaintiffs had implicitly requested to amend their complaint at the dismissal hearing, the record shows that plaintiffs elected to forego that request when they stated: "we believe that the complaint as filed includes sufficient facts to form the basis for a conclusion that both plaintiffs have standing." We cannot find an abuse of discretion in the circuit court's decision to not afford plaintiffs an opportunity they never requested. See, *e.g.*, *Thompson v. N.J.*, 2016 IL App (1st) 142918, ¶ 64 (where the plaintiff admitted that he never requested leave to file an amended complaint, the reviewing court "must assume that the circuit court acted within its discretion in refusing to permit any proposed amendment"). Accordingly, the circuit court properly dismissed plaintiffs' complaint against defendant in this case with prejudice.

¶ 43                                    CONCLUSION

¶ 44     For the foregoing reasons, we affirm the circuit court's judgment dismissing plaintiffs' complaint with prejudice.

¶ 45     Affirmed.

¶ 46     JUSTICE PUCINSKI, dissenting:

¶ 47     I respectfully dissent. Although I agree, for the reasons stated in the majority opinion, that the allegations of the plaintiffs' complaint do not support a finding of standing, I would remand the matter to the trial court to afford plaintiffs the opportunity to amend.

¶ 48     A dismissal with prejudice has the harsh effect of definitively and finally terminating a plaintiff's pursuit of his or her cause of action; there is no opportunity for the plaintiff to correct

errors, expand on allegations, or otherwise amend. See *Jackson v. Alverez*, 358 Ill. App. 3d 555, 559 (2005) (explaining that a dismissal with prejudice means that the trial court will not allow the plaintiff to replead and, thus, such dismissals are final). Although, generally, it is within the trial court's discretion whether to dismiss a complaint pursuant to section 2-615 or 2-619 with prejudice (*Gajda v. Steel Solutions Firm, Inc.*, 2015 IL App (1st) 142219, ¶ 31), that discretion should be exercised liberally in favor of amendment (*Hartshorn v. State Farm Insurance Co.*, 361 Ill. App. 3d 731, 735 (2005)). Liberally allowing amendment serves the primary goal of our legal system—providing litigants with the opportunity to fully and fairly present their causes of action. *Gajda*, 2015 IL App (1st) 142219, ¶ 31; see also *In re Estate of Chernyk*, 138 Ill. App. 3d 233, 236 (1985). Moreover, the liberal allowance of amendments serves society's interest in having cases decided on their merits as opposed to on technicalities. *Smith v. Chemical Personnel Search, Inc.*, 215 Ill. App. 3d 1078, 1084 (1991). "[T]he most important consideration in determining whether an amendment should be allowed is whether it will be in furtherance of justice," and any "[d]oubts should be resolved in favor of the allowance of the amendment." *Id.* at 1085.

¶ 49 In contrast, a dismissal should be with prejudice only when it is clear that the plaintiff is unable to prove any set of facts that would entitle it to relief. *Bruss v. Przybylo*, 385 Ill. App. 3d 399, 406 (2008). "Where a claim can be stated, the trial court abuses its discretion if it dismisses the complaint with prejudice and refuses the plaintiff further opportunities to plead." *Id.*

¶ 50 Here, the trial court, without ever having permitted plaintiffs the opportunity to amend, ended plaintiffs' pursuit of their claims against the City. Although it is true that plaintiffs' complaint did not contain any allegations that the City's actions impaired their provision of services or performance of activities, it is not apparent that plaintiffs would be unable to plead

and prove such allegations if given the opportunity. Certainly, plaintiffs' allegations that the City's actions caused them to divert and reallocate their resources do not necessarily preclude additional allegations that the City's actions impaired the provision of plaintiffs' services or performance of their activities. Because it cannot be said with certainty that plaintiffs would be unable to sufficiently allege their standing in an amended complaint, that doubt should have been resolved in their favor, and the trial court should have afforded them the opportunity to amend. To deny plaintiffs the opportunity to amend, especially where they had not previously been afforded that opportunity, does not further the ends of justice, unnecessarily and improperly avoids rendering a decision on the merits, and denies plaintiffs the chance to fully present their claims. For those reasons, I believe that the trial court should have permitted plaintiffs the opportunity to amend their complaint and that failing to do so was an abuse of discretion. See *Gajda*, 2015 IL App (1st) 142219, ¶ 34 ("Because with amendment claims for employee misclassification and retaliation under the [Employee Classification Act (820 ILCS 185/60 (West 2012))] could be stated, the court erred in dismissing these counts with prejudice."). Accordingly, I would remand this matter to the trial court with instructions to permit plaintiffs to amend their complaint.

¶ 51    In so concluding, I recognize that plaintiffs did not formally request leave to amend their complaint in their written response to the City's motion to dismiss. During the arguments on the motion to dismiss, however, plaintiffs' counsel stated to the trial court that, although they believed their complaint contained sufficient allegations to support a finding of standing as to both plaintiffs, the plaintiffs' allegations of injury "could certainly be supplemented in an amended complaint if it needed to be." I think this statement clearly constitutes a request for leave to amend if the trial court concluded (as it did) that the allegations in plaintiffs' complaint

did not support a finding of standing. Moreover, it suggests that even plaintiffs' counsel believed that amendment could cure the alleged defects.

¶ 52    In light of the harsh effect a dismissal with prejudice has on a plaintiff's ability to seek justice, public policies favoring amendment and decisions on the merits, and the fact that plaintiffs' existing allegations are not inherently inconsistent with additional allegations that the City's actions impaired plaintiffs' provision of services and performance of activities, I believe that we should remand this matter to the trial court with instructions that it grant plaintiffs the opportunity to file an amended complaint.

**No. 1-19-2099**

| | |
|---|---|
| **Cite as:** | *Grassroots Collaborative v. City of Chicago*, 2020 IL App (1st) 192099 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2019-CH-04888; the Hon. Neil H. Cohen, Judge, presiding. |
| **Attorneys for Appellant:** | Aneel L. Chablani, Gavin Kearney, and Clifford Helm, of Chicago Lawyers' Committee for Civil Rights, of Chicago, and Jon Greenbaum (*pro hac vice*), Thomas Silverstein (*pro hac vice*), and Megan Reif (*pro hac vice*), of Lawyers' Committee for Civil Rights Under Law, of Washington, D.C., for appellants. |
| **Attorneys for Appellee:** | Mark A. Flessner, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Elizabeth Mary Tisher, Assistant Corporation Counsel, of counsel), for appellee. |