(No. 66582.—)

LANDMARKS PRESERVATION COUNCIL OF ILLINOIS *et al.*, Appellants and Cross-Appellees, v. THE CITY OF CHICAGO *et al.*, Appellees and Cross-Appellants.

*Opinion filed September 22, 1988.—Rehearing denied December 5, 1988.*

Thomas Campbell and Edward S. Weil, of Chicago (Gardner, Carton & Douglas, of counsel), for appellants and cross-appellees.

Judson H. Miner, Corporation Counsel, of Chicago (Philip L. Bronstein, Ruth M. Moscovitch, and Mary L. Mikva, of counsel), for appellees and cross-appellants.

JUSTICE CUNNINGHAM delivered the opinion of the court:

The three plaintiffs in this action are Landmarks Preservation Council of Illinois (Preservation Council),

an Illinois not-for-profit corporation whose stated primary purpose is to "promote public appreciation and continued use of landmark buildings"; National Trust for Historic Preservation in the United States (National Trust), a congressionally chartered not-for-profit corporation whose stated purposes are, *inter alia*, to facilitate public participation in the preservation of sites, buildings and objects of national significance and to preserve and administer properties for the public benefit; and Chicago Chapter, American Institute of Architects, an Illinois not-for-profit corporation of professional architects whose stated primary purposes are to "promote the aesthetic, scientific and practical efficiency of the architectural profession, to advance the science and art of building and to advance the educational standards of the profession."

In the circuit court of Cook County, plaintiffs filed the instant action against defendants, City of Chicago (City) and American National Bank & Trust Company of Chicago (American National). American National was sued as trustee under trust No. 7966, a land trust which holds title to the McCarthy Building, the facades of which building the City declared a Chicago landmark in 1984, but whose landmark status was rescinded by ordinance on September 23, 1987.

Alleging that the procedures used for rescinding the landmark designation failed to comply with requirements of a Chicago ordinance, plaintiffs requested that the court "enter a declaratory judgment finding that the ordinance adopted September 23, 1987, repealing the earlier ordinance which designated the McCarthy Building a Chicago landmark, is null and void." Plaintiffs also requested that the circuit court enjoin the City "from issuing any permit for the alteration, construction, reconstruction, erection, demolition, relocation or other work until such time as written approval for such permit is se-

cured from the Landmarks Commission pursuant to section 21—77 of the Municipal Code." Plaintiffs further asked that the court "enjoin American National, as the building's owner, from taking any action in reliance on the City's attempt of September 23, 1987 to rescind the Chicago landmark designation for the McCarthy Building."

The circuit court dismissed the complaint for failure to state a cause of action. Pursuant to Supreme Court Rule 302(b) (107 Ill. 2d R. 302(b)), plaintiffs appealed directly to this court. Defendants cross-appealed, contending that plaintiffs lacked standing to bring this action.

## I. FACTS
### A. The Chicago Landmarks Ordinance

The Chicago Landmarks Ordinance (Landmarks Ordinance) sets forth procedures for designating a building a "Chicago landmark." This ordinance was amended on March 11, 1987, but the pertinent procedures appearing in the new ordinance (procedures set out in sections 21—67 through 21—73 of the Municipal Code of Chicago) are substantially similar to those in the former ordinance (formerly set out in sections 21—64(c) through 21—64(f) of the Municipal Code of Chicago). The ordinance creates a "Commission on Chicago landmarks" (Chicago Municipal Code §21—63 (1987)), which is directed to familiarize itself with areas and structures in Chicago and to recommend to the city council designation of certain such areas and structures as "Chicago landmarks" (Chicago Municipal Code §21—65 (1987)). In determining whether to recommend a particular site, the commission is to consider only certain enumerated criteria which relate primarily to the building's historical, architectural and cultural significance. (Chicago Municipal Code §21—66 (1987).) Upon making a preliminary determination that a site should be deemed a Chicago landmark, the commis-

sion is to request a report from the commissioner of planning. (Chicago Municipal Code §21—68 (1987).) In the report, the commissioner is to evaluate "the relationship of the proposed designation to the comprehensive plan of Chicago and the effect of the proposed designation on the surrounding neighborhood." (Chicago Municipal Code §21—68 (1987).) In the report the commissioner is also to make a recommendation of approval, rejection or modification of the proposed designation.

After receiving the report, the commission is to notify the property's owner of the proposed designation and request his consent to the designation. (Chicago Municipal Code §21—68 (1987).) If the owner does not consent to the proposal, then the commission, following proper notice, is to hold a public hearing. The ordinance provides for participation by various individuals and entities as follows:

> "Any person, organization or other legal entity whose use or whose members' use or enjoyment of the area, district, place, building, structure, work of art, or other object proposed for designation may be injured by the designation or the failure of the Commission to recommend designation may become a party to a designation proceeding." Chicago Municipal Code §21—71 (1987).

Within 30 days following the hearing (if one is required), the commission is to determine whether to recommend the proposed landmark designation to the city council. (Chicago Municipal Code §21—72 (1987).) The city council is then to consider the findings, recommendation and record of the commission and determine whether to (by ordinance) designate such place or object a Chicago landmark. In making this determination, the city council may, in its discretion, hold public hearings. Chicago Municipal Code §21—73 (1987).

The ordinance contains an additional provision which, in plaintiffs' view, is of critical significance to the out-

come of this case. The provision is contained in section 21—76, and reads, "any designation of an area, district, place, building, structure, work of art, or other similar object as a 'Chicago landmark' shall only be amended or rescinded in the same manner and procedure as the original designation was made."

## B. Events Leading to Designation of the McCarthy Building as a Chicago Landmark

The McCarthy Building was designated an official Chicago landmark in accordance with the procedure prescribed by ordinance. Specifically, the commission made a preliminary determination of the building's potential landmark status, and the commissioner submitted to the commission a report recommending the building's designation as a landmark. The commission then notified the owner of the proposed designation and subsequently (following notice to potentially interested parties) held a public hearing regarding the proposed designation. The Preservation Council testified at the hearing in support of having the McCarthy Building's facades designated a landmark, and presumably the other plaintiffs herein could have testified had they chosen to do so. The commission then voted to recommend the designation, and submitted its recommendation to the city council. The city council's committee on cultural development and historical landmarks preservation conducted public hearings on the proposed designation, and subsequently recommended to the full city council that the building be designated a landmark. The city council then enacted an ordinance designating the facades of the McCarthy Building a Chicago landmark.

## C. Events Leading to Decertification of the McCarthy Building as a Chicago Landmark

The McCarthy Building is located in an area of Chi-

cago (Block 37) which, the parties agree, has long been considered one of the cornerstones of Chicago's "North Loop Redevelopment Project," a plan to rejuvenate Chicago's North Loop. One objective of this project is the preservation of historically and architecturally significant buildings, where doing so is economically viable. In 1982, the City, to further promote this development project, published the "North Loop Guidelines for Conservation and Redevelopment" (Guidelines), which contained the finding that "[t]hrough specific effort, [the Reliance Building, the Chicago Theatre and the McCarthy Building] can be rehabilitated for reuse consistent with these Guidelines." This finding was apparently still believed accurate when the city council designated the McCarthy Building's facades a landmark.

After the building's facades had been declared a Chicago landmark, however, and as the North Loop development plans continued, facts came to light which cast doubt on the conclusion that the McCarthy Building could be integrated into the redevelopment. The Commercial District Development Commission (Development Commission) received from its department of planning a previously requested staff report addressing these belatedly discovered problems. This report, according to defendants, was made available for public review on August 18, 1987.

The staff report summarized the public benefits of developing Block 37, stating that it "is the most important retail site in the North Loop and has the potential to make a significant impact on the revitalization of State Street." The report further noted the urgency in getting this project underway "so that demand does not shift to other locations."

The report also set forth serious design constraints that, in the opinion of the report's authors, would not permit the development to go forward without encroach-

ing upon the site occupied by the McCarthy Building. One constraint involved the "above-grade section" of the Commonwealth Edison substation. Initially, it had been thought that the above-grade station could be relocated and an office tower built upon that location. Apparently, it later became evident that the above-grade station could not be relocated and would have to be integrated into the development. This necessitated that the initial plans for locating the office tower be altered, and it was concluded that the office tower would have to encroach upon what is now the McCarthy Building.

Another constraint apparently involved an initial plan to use a "service tunnel" for access to Block 37, which plan was subsequently deemed "not a realistic option." It was determined, according to the staff report, that ramps would have to be used instead. The location of one proposed ramp would be "in direct conflict with" the McCarthy Building.

In conjunction with issuing the report, the Development Commission adopted several resolutions recommending that the city council approve amendments to the Guidelines, which amendments would eliminate the requirement that the McCarthy Building be retained. On September 22, 1987, a joint committee of the city council's committees on finance and on cultural development and historical landmark preservation, after having reviewed the staff report, forwarded to the city council a unanimous recommendation that the council adopt the Commercial District Development Commission's resolutions. Defendants state that this joint committee submitted the recommendation only after conducting a public hearing, though we can find no verification of this in the record. On September 23, 1987, the city council approved the amendments to the Guidelines, executed a redevelopment agreement and contract with the developer and adopted a schedule for redevelopment of Block 37

that included utilization of "quick-take" proceedings to acquire the land in Block 37. In addition, the city council specifically adopted, by a vote of 41 to 7, an ordinance repealing the previous ordinance designating the McCarthy Building as a Chicago landmark. Specifically, the city council ordained, "notwithstanding the landmark ordinance (ch. 21—64 through 21—95) or any other provisions of the Municipal Code of Chicago, the ordinance designating the McCarthy Building a Chicago landmark passed on June 6, 1984 *** is hereby repealed."

In this ordinance several legislative findings are made, including:

> "Certain design constraints, which only subsequently became apparent, relating to the inability to locate an office tower over the Commonwealth Edison substation and the infeasibility of constructing a necessary service tunnel from lower Wacker Drive for delivery vehicles, compel the conclusion that the McCarthy Building cannot be retained on block 37 in its present site; *** the public benefits of the redevelopment of block 37 as reflected by the expected incremental tax revenues to be generated within the redevelopment project area, expanded employment opportunity and revitalized economic activity, significantly outweighs the architectural or aesthetic value of the McCarthy Building."

Certain alleged deficiencies in the above-summarized procedure prompted the instant action. Defendants moved to dismiss, contending that (1) plaintiffs lacked standing to challenge the city council's action, (2) legislative acts of the city council in passing the September 23, 1987, ordinance are not reviewable and (3) the September 23, 1987, ordinance expressly superseded the procedures articulated in the Landmarks Ordinance insofar as they were inconsistent with the ordinance repealing the landmark designation of the McCarthy Building. The circuit court found that plaintiffs had standing but that no

valid cause of action existed because the disputed procedure taken by the city council was nonreviewable.

## II. STANDING

We turn first to the question whether the circuit court properly denied defendants' motion to dismiss the complaint for lack of standing. In this regard we address plaintiffs' contention that defendants failed to preserve this question for appeal. Specifically, plaintiffs contend that defendants' cross-appeal raising this issue is untimely.

The circuit court entered final judgment on January 5, 1988, and plaintiffs filed a notice of appeal on February 10, 1988. The clerk of the circuit court received the City's notice of cross-appeal on February 23, 1988. Plaintiffs submit that since Supreme Court Rule 303(a)(3) (107 Ill. 2d R. 303(a)(3)) requires that a cross-appeal be filed within 10 days after defendants are served with the notice of appeal, the notice of cross-appeal was untimely. Defendants point out that they mailed the notice of cross-appeal within the 10-day time frame and, citing *Holesinger v. Dubuque Feeder Pig Co.* (1982), 104 Ill. App. 3d 39, 41-43, and *Department of Conservation v. B. & O. R.R.* (1982), 103 Ill. App. 3d 417, 421-22, argue that the date of mailing is controlling.

Generally, the denial of a motion to dismiss is not, of itself, a final appealable order. (See *Anderson v. Sutter* (1983), 119 Ill. App. 3d 1070, 1077.) Moreover, findings of the circuit court adverse to the appellee do not require that the appellee cross-appeal if the judgment of the circuit court was not, at least in part, against him. (*Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387.) Further, a reviewing court may sustain the decision of the circuit court on any grounds called for by the record, regardless of whether the circuit court made its decision on the proper ground.

(*Estate of Johnson v. Condell Memorial Hospital* (1988), 119 Ill. 2d 496, 502.) In view of these principles, we do not believe that defendants were required to file a cross-appeal in order to bring the issue of standing to the attention of this court.

We now turn to the question whether either the Preservation Council or the Chicago Chapter, American Institute of Architects, has standing to maintain this interest. We recognize that, in defining their own organizational purposes, these plaintiffs have declared themselves interested in matters such as this. Standing, however, requires some injury in fact to a legally recognized interest (*Glazewski v. Coronet Insurance Co.* (1985), 108 Ill. 2d 243, 254), and a prospective party cannot gain standing merely through a self-proclaimed concern about an issue, no matter how sincere.

In our view neither these two litigants nor their members have a legally cognizable stake in the status of the McCarthy Building. None is an owner of this private property or even an owner of adjoining property. As far as we are aware, none has any protectable right to even use the building. Their only interest appears to be the ability to view this private property from a public street. We have previously indicated that aesthetic interests, while not to be disregarded, are not controlling on the question of standing (*Harris Trust & Savings Bank v. Duggan* (1983), 95 Ill. 2d 516), and on the facts of this case we are not convinced of the need to depart from this principle. Nor are we prepared to recognize as a basis for standing an alleged right to participate in a public hearing for participation's sake, at least where, as here, a municipality has bestowed that alleged procedural right apparently not as a legal entitlement but as a tool to assist the municipality in performing its legislative function.

We now turn to the question whether the National Trust has standing to maintain this action. Were the National Trust an individual or a privately chartered corporation, we would likely conclude that it too lacks standing, for reasons discussed above. The National Trust, however, was created by a Federal law. The National Trust emphasizes, and we agree, that it "has a legally cognizable interest which is reflected in its congressional mandate." The National Trust points to section 468C of the Historic Sites, Buildings and Antiquities Act (16 U.S.C. §468C), which specifies that the National Trust is authorized to sue and be sued in its corporate name "[t]o the extent necessary to enable it to carry out the functions vested in it by sections 468 to 468e."

We have closely examined the functions vested in the National Trust, and we agree that Congress intended the National Trust's functions to be extremely broad. We note in particular section 468, which states:

> "In order to further the policy enunciated in sections 461 to 467 of this title, and to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest, there is created a charitable, educational, and nonprofit corporation to be known as the National Trust for Historic Preservation in the United States, hereafter referred to as the 'National Trust.' The purposes of the National Trust shall be to receive donations of sites, buildings, and objects significant in American history and culture, to preserve and administer them for public benefit, to accept, hold, and administer gifts of money, securities, or other property of whatsoever character for the purpose of carrying out the preservation program, and to execute such other functions as are vested in it by sections 468 to 468e of this title." 16 U.S.C. §468 (1982).

The National Trust was thus created in part to establish the "policy enunciated in sections 461 to 467," and this policy is in part "to preserve for public use historic

sites, buildings, and objects of national significance for the inspiration and benefit of the people of the United States." (16 U.S.C. §461 (1982).) It appears to us that in bestowing powers on the National Trust in order to further this broad national policy, Congress intended to permit the National Trust to, *inter alia*, object to the allegedly unlawful destruction of buildings such as the McCarthy Building, which the National Trust deems of national historic significance, even if those buildings have not been officially declared "national landmarks." This is particularly true with respect to the McCarthy Building, which in 1976 was listed in the National Register of Historic Places. This congressional intent is apparent from both the language of the Act, its legislative history (see S. Rep. No. 1110, 81st Cong., 1st Sess. (1949); H.R. Rep. No. 855, 81st Cong., 1st Sess. (1949) (both reprinted in 1949 U.S. Code Cong. & Admin. News 2285)), and sound reasoning. It seems essential that, in order to perform its congressionally mandated functions, the National Trust must be allowed to maintain suits in State courts to prevent unlawful destruction of buildings it deems of national historic significance. This is essential because, in many cases, there would be no basis for the National Trust to pursue such actions in Federal court. This is illustrated by the instant case, in which the law allegedly violated is not Federal.

We thus conclude that Congress intended the National Trust to have standing to maintain actions such as this, and that such standing is necessary if the National Trust is to fulfill the functions Congress intended it to fulfill. The United States Constitution declares that laws promulgated pursuant to it are "the supreme Law of the Land" regardless of any State law to the contrary. (U.S. Const., art. VI, cl. 2.) Accordingly, in the absence of any challenge to the constitutionality of these Federal statutory provisions, we must abide by the congressional in-

tent which we have herein discerned. This court will not *sua sponte* question the constitutionality of a Federal statute, but will generally do so only at the request of a party directly affected by its invalidity. *Goldblatt Brothers, Inc. v. Industrial Comm'n* (1981), 86 Ill. 2d 141; *People v. Vandiver* (1971), 51 Ill. 2d 525; *People v. Reiner* (1955), 6 Ill. 2d 337.

Because we have found that the National Trust has standing, we are required to reach the merits of this case. In so doing, as explained below, we conclude that the circuit court properly dismissed the case for failure to state a cause of action.

### III. VALIDITY OF SEPTEMBER 23, 1987, ORDINANCE

We next turn to an analysis of the validity of the disputed ordinance enacted by the City. In evaluating the ordinance, we must keep in mind that under the 1970 Illinois Constitution, the City is a home rule unit of local government. The 1970 Constitution of Illinois bestows broad authority on home rule units. In article VII, section 6(a), it is stated in part:

"Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." (Ill. Const. 1970, art. VII, §6(a).)

The powers and functions of home rule units shall be construed broadly. (Ill. Const. 1970, art. VII, §6(m).) It has been stated that home rule units have the same powers as the sovereign except where such powers are limited by the General Assembly. *City of Urbana v. Houser* (1977), 67 Ill. 2d 268, 273.

Bearing in mind the broad authority of a home rule unit, we find controlling a principle articulated in *Illi-*

*nois Gasoline Dealers Association v. City of Chicago*
(1988), 119 Ill. 2d 391. In *Illinois Gasoline Dealers Association*, the plaintiffs asserted that a fuel tax ordinance
was improperly removed from committee and therefore
improperly adopted. The plaintiffs' claim there was
based on an alleged violation by the city council of one of
its own rules. We declined to review the plaintiffs' assertions in this regard, since the plaintiffs did not claim
that the allegedly improper adoption was a violation of
any constitutional or statutory provision. (119 Ill. 2d at
404.) It is true, as the National Trust points out, that the
rule allegedly violated in *Illinois Gasoline Dealers Association* was an internal rule rather than an ordinance,
but this distinction is not controlling here. In *Illinois
Gasoline Dealers Association*, we quoted with approval
the following language in *Chirikos v. Yellow Cab Co.*
(1980), 87 Ill. App. 3d 569, 574:

> "This court cannot handle matters which in effect are attempts to overrule decisions of a legislative body based
> upon alleged failure to follow requirements imposed by
> that body itself. *** We have authority to invalidate legislation adopted by the city council only upon grounds that
> the enactment violates a provision of the Federal or State
> constitutions or violates the mandate of a State or Federal statute."

We find this language applicable here, and we may not
hold invalid the disputed ordinance unless it was enacted
in violation of a constitutional provision or a provision of
a State or Federal statute.

The National Trust has not pointed out, and we have
not discovered, any Federal or State statutory provision
infringed by the amendatory ordinance in question. We
also note, without meaning to imply that any constitutional violation is readily apparent, that the National
Trust has not alleged that the disregard of certain procedures in enacting the ordinance was unconstitutionally

arbitrary; the National Trust has not contended that the ordinance was enacted in violation of constitutional guarantees of equal protection, procedural due process or substantive due process. Because we can invalidate an ordinance only when it violates a constitutional provision or a State or Federal statute, and because no such violation is asserted here, we must affirm the circuit court's ruling that plaintiffs have failed to state a cause of action.

In reaching our conclusion that this case is controlled by *Illinois Gasoline Dealers Association,* we observe that in enacting the disputed ordinance, the City was functioning as a legislative body rather than, as the National Trust suggests, an administrative body. We recognize that a municipality may in some instances be required to perform an administrative function either directly or through the establishment of a separate board or agency. For example, section 11—13—3 of the Illinois Municipal Code (Ill. Rev. Stat. 1987, ch. 24, par. 11—13—3) requires that certain municipalities establish a zoning board of appeals, an administrative body. (See also 1 Am. Jur. 2d *Administrative Law* §58 (1962) (discussing a multitude of situations in which legislative bodies may come within the term "administrative agency").) In the instant case, however, what is involved is not the performance of an administrative function pursuant to the General Assembly's delegation of authority, but the performance of a legislative function authorized by the home rule provisions of the Illinois Constitution.

Plaintiffs have cited numerous cases involving zoning ordinances, which cases they believe dictate that the ordinance at issue here is void for failure to comply with procedural requirements of an earlier ordinance. We find it necessary to discuss some of these cases in detail.

Prior to the institution of constitutionally granted home rule authority, municipalities looked to the General

Assembly to grant them limited authority to enact zoning laws. Since a legislative grant of authority was the source of a municipality's limited ability to zone, it necessarily followed that zoning action had to be exercised within the boundaries of the delegated authority. Thus, this court and lower courts necessarily struck down ordinances which were enacted in violation of the limited authority bestowed by the General Assembly. For example, in *Treadway v. City of Rockford* (1962), 24 Ill. 2d 488, cited by the National Trust, this court held that a cause of action could be stated to have a zoning ordinance declared void where it was alleged that, in enacting the ordinance, the city council violated the then-existing zoning enabling act by neglecting to follow certain petition and publication requirements mandated in the zoning enabling act. This court stated that it is obvious that, when a statute prescribes certain steps as conditions to the enactment of an ordinance, those conditions must be substantially complied with. This holding in *Treadway* is not, of course, applicable here, since the City is a home rule unit, and its authority to enact the instant ordinance derives not from a zoning act but from the home rule provisions of the Illinois Constitution.

*Dicta* can be found in *Treadway* indicating that a zoning ordinance amendment which is enacted in violation of the procedural requirements of an earlier, more general zoning ordinance is void. In *Treadway*, the court stated:

> "[W]e have further held that where a general zoning ordinance includes additional procedural requirements for its amendment, not inconsistent with those of the statute, these requirements must also be complied with." (24 Ill. 2d at 496.)

In making this statement, the court in *Treadway* cited *Cain v. Lyddon* (1931), 343 Ill. 217, which so stated. A

similar conclusion was reached in *Cosmopolitan National Bank v. City of Chicago* (1963), 27 Ill. 2d 578.

In view of the holding in *Illinois Gasoline Dealers Association* and our holding today, *Cain, Cosmopolitan,* and the *dicta* in *Treadway* can be legitimately distinguished only on the basis either that the disregard of the procedural provisions involved therein was unconstitutionally arbitrary (an issue not raised here) or that the nonuniform application of the municipality's own procedural provisions was inconsistent with the General Assembly's intent in delegating limited zoning authority to municipalities in the then-existing zoning act. As stated in *Cain,* "[i]n *Michigan-Lake Building Corp. v. Hamilton* [1930], 340 Ill. 284, this court emphasized the fact that careful, serious and intelligent consideration of amendments to zoning ordinances is contemplated by the Zoning act." 343 Ill. at 221.

For the foregoing reasons, the decision of the circuit court dismissing plaintiffs' complaint for failure to state a cause of action is affirmed.

*Affirmed.*