NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241213-U

NO. 4-24-1213

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 5, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| HUMANE FARMING ASSOCIATION, a California Non-Profit Organization; SHOWING ANIMALS RESPECT AND KINDNESS (SHARK), an Illinois Non-Profit Organization; and STEVE HINDI, in His Individual Capacity, | ) ) ) ) ) | Appeal from the Circuit Court of Boone County No. 23MR30 |
|       Plaintiffs-Appellants, | ) | |
|       v. | ) | |
| THE BOONE COUNTY BOARD; THE BOONE COUNTY BUILDING AND ZONING DEPARTMENT; THE BOONE COUNTY ZONING BOARD OF APPEALS, | ) ) ) ) | |
|       Defendants, | ) | |
|       and | ) | |
| PEDRO MORALES and GRACIE H. ROBLES, | ) | |
|       Real Parties in Interest | ) | |
| (The Boone County Board; The Boone County Building and Zoning Department; and The Boone County Zoning Board of Appeals, Defendants-Appellees). | ) ) ) ) | Honorable Donald P. Shriver, Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices DeArmond and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed the trial court's dismissal of plaintiffs' amended complaint, finding they lacked standing to challenge a Boone County zoning officers' issuance of temporary use permits for "Mexican Rodeos," because (1) Illinois does not recognize "aesthetic" injury as a basis for standing, (2) plaintiff organizations' individual members did not have standing to sue in their own right, (3) the organizations did not suffer any "organizational" injury, and (4) plaintiffs were not "aggrieved" under the local zoning ordinance.

¶ 2    Plaintiffs, Humane Farming Association (HFA), Showing Animals Respect and

Kindness (SHARK), and Steve Hindi, were appalled by the treatment of animals they observed at

certain Boone County "Mexican Rodeos." They brought their grievances to the local zoning officer, urging him to stop granting temporary use permits (TUPs) to event organizers who mistreated animals. When the zoning officer continued granting the permits, plaintiffs attempted to appeal the officer's decisions to the Boone County Zoning Board of Appeals (Zoning Board), but the Zoning Board refused to hear their appeals. Plaintiffs sued the Boone County Board, the Boone County Building and Zoning Department, and the Zoning Board in the circuit court of Boone County. The court dismissed their amended complaint for lack of standing.

¶ 3        Plaintiffs appeal, arguing defendants' refusal to hear their appeal injured their legally cognizable rights or interests, and the trial court erred by dismissing their amended complaint.

¶ 4        We affirm.

¶ 5                                I. BACKGROUND

¶ 6        Because plaintiffs appeal the trial court's order granting defendants' motion to dismiss under section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2024)) based on lack of standing, we take as true all well-pleaded allegations in plaintiffs' amended complaint. See *Illinois Road & Transportation Builders Ass'n v. County of Cook*, 2022 IL 127126, ¶ 12.

¶ 7                                A. *Coleadero*

¶ 8        According to plaintiffs, for years, Boone County has hosted "*charreadas*"—traditional Mexican equestrian competitions, similar in some ways to American rodeos. Each *charreada* involves a series of separate events, including the "*coleadero*." In the *coleadero*, a competitor on horseback chases a bull around an arena, with the goal of catching the bull by the tail. Once he catches the bull, the competitor tries to drag the bull to the ground by wrapping the

bull's tail around the competitor's leg. Plaintiffs claim that the Mexican Federation of *Charrería* publishes rules and regulations for *charreadas*, including the requirement that animals "shall be treated humanely and with respect by each and every federated member." These rules also prohibit the use of injured or physically impaired animals.

¶ 9                                     B. Boone County Zoning Ordinances

¶ 10          Boone County, through the Zoning Board, has adopted ordinances governing the use of buildings, structures, and land. See Boone County Zoning Ordinance § 1.1 (eff. May 20, 2009). "Zoning enforcement officers" enforce those ordinances. See Boone County Zoning Ordinance § 2.2.1 (eff. July 9, 2008). The ordinances provide for TUPs for "certain transitory or seasonal uses." Boone County Zoning Ordinance § 4.2.1 (eff. July 20, 2011). Applications for TUPs must be submitted to the zoning officer "at least 14 days before the commencement of the temporary use," and the "zoning enforcement officer is authorized to issue a permit" if the proposed use satisfies the ordinances' requirements. Boone County Zoning Ordinance § 4.2.2 (eff. June 9, 2022). The ordinances also provide:

> "The zoning enforcement officer shall issue a [TUP] only if the following conditions have been met:
>
> * * *
>
> D. All conditions specified in the specific regulations of this section are met;
> ***
>
> F. The zoning enforcement officer shall have the authority to deny a [TUP] if the applicant has a demonstrated and documented failure to comply with the regulations of a similar previously granted temporary use. The zoning enforcement officer reserves the right to deny the issuance of the [TUP] for a specified time,

based on non-compliance with section 4.2." Boone County Zoning Ordinance § 4.2.6 (eff. June 9, 2022).

¶ 11 Section 4.2.3(A)(1) regulates any "Animal Show/Rodeo." In early 2023, section 4.2.3(A)(1)(b) required compliance with any rules promulgated by "the Mexican Federation of [*Charrería*] or any other appropriate regulatory authority for animal shows/rodeos." Boone County Zoning Ordinance § 4.2.3(A)(l)(b) (eff. June 9, 2022). The ordinances also stated:

> "a. Prohibited activities*:* Horse poling or tripping, horse tailing, and horse heeling are prohibited. All rodeos and charreadas must comply with the laws of the State of Illinois. Events that cause the intentional harm of an animal or are in violation of the Animal Welfare Act (225 ILCS 605) and the Illinois Humane Care for Animal Act (510 ILCS 70) are also prohibited." Boone County Zoning Ordinance § 4.2.3(A)(l)(a) (eff. June 9, 2022).

These ordinances were amended in March 2024, and Boone County no longer prohibits "events that cause the intentional harm of an animal" in violation of Illinois law. Boone County Zoning Ordinance § 4.2.3(A)(1)(a) (eff. March 22, 2024).

¶ 12 Finally, section 2.9 governs appeals of zoning officer decisions. Section 2.9.1 states:

> "An appeal to the zoning board of appeals may be made by any person, firm, or corporation, or by any office, department, board, or bureau aggrieved by a decision of the zoning enforcement officer under this ordinance in accordance with Illinois Compiled Statutes" Boone County Zoning Ordinance § 2.9.1 (eff. July 9, 2008).

Section 2.9.3 provides that an "appeal stays all the proceedings in furtherance of the action

appealed from." Boone County Zoning Ordinance § 2.9.3 (eff. July 9, 2008). Section 2.9.4 states, "The zoning board of appeals shall fix a reasonable time for the hearing of the appeal and give due notice thereof to the parties and decide the same within a reasonable time." Boone County Zoning Ordinance § 2.9.4 (eff. July 9, 2008).

¶ 13                                C. Plaintiffs

¶ 14        HFA is a nonprofit organization headquartered in California. According to the amended complaint, they "work to protect farm animals through groundbreaking legislation, anti-cruelty investigations, legal action, and direct care for abused animals. In advance of its organizational mission to protect farm animals, and separate from this lawsuit, HFA has expended organizational resources to counteract animal cruelty at rodeo events." SHARK, another nonprofit organization, is located in Geneva, Illinois. Their aim is to address "animal abuse whenever and wherever possible." According to the amended complaint, they have "worked tirelessly to document the animal abuse and cruelty that occurs at modern animal rodeos throughout Illinois, and nationwide." Hindi is SHARK's founder and president. He has attended many Boone County rodeo events. He is "deeply affected by the animal cruelty he witnesses at these events and suffers physical manifestations of the emotional distress he experiences during the events and in the days following similar to the symptoms of Post-Traumatic Stress Disorder."

¶ 15                          D. Plaintiffs' Advocacy Efforts

¶ 16        Plaintiffs claim they have attended Boone County *charreadas* for years, "documenting the extensive animal cruelty on display at these Animals Shows." For example, they allege they have observed bulls dragged to the ground so forcefully that their horns, backs, or legs are broken. Further, they allege that competitors continued chasing and wrestling these injured cattle. Additionally, according to plaintiffs, the competitors sometimes "deglov[e]" the cattle,

"ripping the entire skin sheath and skirt/mane off of animals' tails as the animals are thrown to the ground." Plaintiffs add, "In some cases, *La Charreada* riders wave the tail remnants in the air as a sign of victory." Plaintiffs have campaigned against Boone County's *charreadas* by sending personnel and drones to observe and document this alleged cruelty to animals and by speaking at meetings of the Boone County Board to educate elected officials.

¶ 17        As part of their campaign, on March 6, 2023, plaintiffs sent a letter to defendants asking that they stop issuing TUPs for any events featuring "Mexican Rodeos," or *coleaderos*. They argued that section 4.2.3(A)(1)(a) and (b) of the Boone County zoning ordinances prohibited animal cruelty, Boone County *coleadero* event operators violated this ordinance, and defendants should deny any further TUPs for such events. Plaintiffs also stated they intended to appeal any TUPs issued for *charreadas* to the Zoning Board.

¶ 18        On March 31, 2023, an event organizer applied for a TUP for a "Mexican Rodeo" that would take place on April 15, 2023. Plaintiffs sent defendants a letter opposing the TUP, claiming they had documented animal cruelty at a previous event at the same location as the proposed April 15 event. Plaintiffs repeatedly contacted defendants, seeking confirmation that the TUP had been issued so they could appeal to the Zoning Board. Defendants did not respond to plaintiffs' requests.

¶ 19        On April 14, 2023, plaintiffs, assuming that the zoning officer granted or would grant the TUP, submitted an appeal of the presumed decision by e-mail. The event took place on April 15, 2023. On April 17, defendants' attorney informed plaintiffs that the TUP was approved at around 9 p.m. on April 14, 2023, through defendants' "Cloud Permitting software," and, at the time plaintiffs submitted their appeal, there was not yet any TUP for plaintiffs to appeal. On May 4, 2023, plaintiffs attempted to appeal again. Initially, defendants scheduled a hearing on the TUP

for May 23, 2023. The hearing was then continued until June 27, 2023.

¶ 20    Meanwhile, plaintiffs learned of another application for a TUP for a "rodeo event" scheduled for June 10, 2023. Plaintiffs again sent defendants a letter opposing the application. Defendants did not respond to plaintiffs' letter, and plaintiffs submitted a "presumptive appeal" on June 8, 2023. Defendants responded that the Zoning Board could not provide any remedy, and the appeal was dismissed as moot. Defendants also canceled the hearing for June 27, 2023. Plaintiffs made further efforts to appeal the decision, which defendants also refused.

¶ 21    In August 2023, HFA and SHARK filed a four-count complaint in trial court. First, they sought a writ of *mandamus* ordering defendants to comply with Boone County Zoning Ordinance section 2.9.1, which allows appeals to the Zoning Board by any "aggrieved" person. Boone County Zoning Ordinance § 2.9.1 (eff. July 9, 2008). Second, they sought a writ of *mandamus* ordering defendants to comply with the ordinances' prohibition on events that cause intentional harm to animals. See Boone County Zoning Ordinance § 4.2.3(A)(l)(a) (eff. June 9, 2022). Specifically, HFA and SHARK asked the court to order defendants to deny TUPs to any event operators proven to have caused the intentional harm of animals or to have violated the Animal Welfare Act (225 ILCS 605/1 *et seq.* (West 2022)) or the Humane Care for Animals Act (510 ILCS 70/1 *et seq.* (West 2022)). Third, they sought administrative review of defendants' decisions to issue TUPs for the events on April 15, 2023, and June 10, 2023. Fourth, they asked for declaratory and injunctive relief in the form of an order compelling defendants to comply with the zoning ordinances' appeals process.

¶ 22    Defendants moved for dismissal pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2024)). The trial court granted defendants' motion, finding that HFA and SHARK lacked standing. The court reasoned that neither organization had any legal interest in the animals

at these events. They also were not parties to the administrative proceedings before the Zoning Board. Although HFA and SHARK claimed they were injured by seeing the animals mistreated, state and local law permitted the rodeos, so the court could not grant any relief that would address this alleged harm. Furthermore, HFA and SHARK had not shown that "their ability to provide services or their operations" would be affected by defendants' actions. The court allowed plaintiffs leave to replead.

¶ 23        Plaintiffs then filed the amended complaint that provides the basis for this appeal. This amended complaint added Hindi as a plaintiff and detailed his distress resulting from Boone County's *charreadas* and defendants' actions, but it otherwise asserted the same claims and sought the same relief as the first complaint.

¶ 24        Defendants again moved to dismiss, arguing that plaintiffs lacked standing. The trial court agreed. It found the amended complaint did not remedy the problems that resulted in the dismissal of the previous complaint. It added that an "aggrieved party would be the party that's applied for the permit, not a general member of the public who went to one of the rodeos." The court concluded that HFA, SHARK, and Hindi all lacked standing, so it dismissed the amended complaint.

¶ 25        This appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27        Plaintiffs appeal the trial court's decision granting defendants' motion to dismiss the amended complaint. Defendants moved to dismiss pursuant to section 2-619.1 of the Code, which allows a defendant to seek dismissal under both section 2-615 (*id.* § 2-615) and section 2-619 (*id.* § 2-619). "A section 2-615 motion attacks the legal sufficiency of the nonmovants' claim whereas a section 2-619 motion admits the legal sufficiency of their claim but asserts affirmative

defenses or other matters that avoid or defeat it." *Grassroots Collaborative v. City of Chicago*, 2020 IL App (1st) 192099, ¶ 21.

¶ 28 The trial court dismissed plaintiffs' amended complaint based on their lack of standing. "Lack of standing is an 'affirmative matter' that is properly raised under section 2–619(a)(9)." *Glisson v. City of Marion*, 188 Ill. 2d 211, 220 (1999). "Because it is an affirmative defense, it is defendant's burden to plead and prove lack of standing." *Illinois Road & Transportation Builders Ass'n*, 2022 IL 127126, ¶ 12. When considering a motion to dismiss for lack of standing, the court should accept all well-pleaded facts in the plaintiff's complaint as true and make reasonable inferences from those facts in favor of the plaintiff. *Id.* Our review is *de novo.* *Glisson*, 188 Ill. 2d at 220.

¶ 29 Generally, plaintiffs have standing if they suffered some injury in fact to a legally cognizable interest. *Illinois Road & Transportation Builders Ass'n*, 2022 IL 127126, ¶ 13. "The claimed injury may be actual or threatened, and it must be (1) distinct and palpable; (2) fairly traceable to the defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief." *Glisson*, 188 Ill. 2d at 221 (citing *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492-93 (1988)).

¶ 30 Plaintiffs here seek relief in the form of direct administrative review of an agency's action, *mandamus*, an injunction, and declaratory relief. Although slightly different standing rules apply to each form of relief, all require a plaintiff to have suffered some injury to a recognized right or interest. See *Cedarhurst of Bethalto Real Estate, LLC v. Village of Bethalto*, 2018 IL App (5th) 170309, ¶¶ 21-33. Administrative review is available only "to parties of record before the administrative agencies and then only when their rights, duties or privileges are adversely affected by the decision." *Board of Education of Roxana Community School District No. 1 v. Pollution*

*Control Board*, 2013 IL 115473, ¶ 20. To seek a writ of *mandamus*, a party must have a "sufficiently protectable interest pursuant to statute or common law which is alleged to be injured." *Hill v. Butler*, 107 Ill. App. 3d 721, 725 (1982); see *Cedarhurst*, 2018 IL App (5th) 170309, ¶ 31. "A court will only grant *mandamus* if the plaintiff has established: (1) a clear, affirmative right to relief; (2) a clear duty of the public officer to act; and (3) clear authority in the public officer to comply." *McCann v. Dart*, 2015 IL App (1st) 141291, ¶ 16. A party seeking an injunction must "establish that he has a clearly ascertainable right or interest which needs protection. Generally, the doctrine of standing makes it necessary for a party seeking such relief to allege an injury in fact to some substantive interest he possesses which is recognized by statute or common law." *Village of Lake in the Hills v. Laidlaw Waste System, Inc.*, 143 Ill. App. 3d 285, 292 (1986). For declaratory relief, "there must be an actual controversy between adverse parties, with the party requesting the declaration possessing some personal claim, status, or right which is capable of being affected by the grant of such relief." *Greer*, 122 Ill. 2d at 493.

¶ 31        For all four forms of relief, defendants argue that plaintiffs have failed to allege any injury to a legally cognizable right or interest. Plaintiffs own no real estate affected by defendants' implementation of the zoning ordinances. According to defendants, plaintiffs were not parties of record before the administrative agency. See *Board of Education of Roxana Community School District No. 1*, 2013 IL 115473, ¶ 20. The trial court agreed. It also found that neither HFA nor SHARK had any legal interest in the mistreated animals and neither showed that the TUPs affected "their ability to provide services or their operations." Defendants ask us to affirm the trial court's findings that plaintiffs have suffered no injury and that they lack standing under all four counts.

¶ 32        Plaintiffs respond that defendants should have recognized them as parties to the administrative proceedings. For counts I, III, and IV, plaintiffs insist that they had a right to appeal

the zoning officer's issuance of the TUPs to the Zoning Board and that defendants denied them this procedural right and otherwise failed to comply with the ordinances' appeals procedures. For count II, plaintiffs rely on aesthetic, associational, and organizational interests to establish standing.

¶ 33                                  A. Right to Appeal a TUP

¶ 34         Before turning to plaintiffs' claims of aesthetic, associational, and organizational interests, we consider whether Boone County's municipal ordinances guaranteed plaintiffs a right to appeal the zoning officer's decisions. "Municipal ordinances, such as the zoning ordinance at issue here, are interpreted under the general rules of statutory construction and interpretation." *Platform I Shore, LLC v. Village of Lincolnwood*, 2014 IL App (1st) 133923, ¶ 10. Our aim is "to determine the legislative intent, which is best indicated by the statutory language, given its plain and ordinary meaning." *Id.* If "a statutory term is not defined, we assume the legislature intended for it to have its popularly understood meaning. Likewise, if a term has a settled legal meaning, the courts will normally infer that the legislature intended to incorporate that established meaning into the law." *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, ¶ 29. The proper interpretation of a statute is a question of law, which we review *de novo*. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503 (2000).

¶ 35         Section 2.9.1 of Boone County's zoning ordinances states:

> "An appeal to the zoning board of appeals may be made by any person, firm, or corporation, or by any office, department, board, or bureau *aggrieved* by a decision of the zoning enforcement officer under this ordinance in accordance with Illinois Compiled Statutes and the following:" (Emphasis added.) Boone County Zoning Ordinance § 2.9.1 (eff. July 9, 2008).

Thus, whether plaintiffs had a right to appeal turns on whether they qualify as "aggrieved" under the ordinance. The zoning ordinances do not define the term "aggrieved," so we consider whether the term has any "settled legal meaning." See *Rosenbach*, 2019 IL 123186, ¶ 29.

¶ 36 We begin with our supreme court's decision in *Rosenbach*. There, the court considered section 20 of the Biometric Information Privacy Act (BIPA) (740 ILCS 14/20 (West 2016)), which provided a private right of action to "[a]ny person aggrieved by a violation" of the statute's restrictions on the use of "biometric identifiers and information," such as fingerprints or retina scans. See *Rosenbach*, 2019 IL 123186, ¶¶ 19-21. Because BIPA did not define "aggrieved," the court considered the term's "popularly understood" and "settled legal" meaning. *Id.* ¶ 29. The court defined "aggrieved" as " 'having a substantial grievance; a denial of some personal or property right.' " *Id.* ¶ 30 (quoting *Glos v. People*, 259 Ill. 2d 332, 340 (1913)). The court added that " '[a] person is prejudiced or aggrieved, in the legal sense, when a legal right is invaded by the act complained of *or* his pecuniary interest is directly affected by the decree or judgment.' " (Emphasis added.) *Id.* (quoting *Glos*, 259 Ill. 2d at 340). The *Rosenbach* court determined that BIPA "codified that individuals possess a right to privacy in and control over their biometric identifiers and biometric information," and any violation of that right qualified an individual as "aggrieved." *Id.* ¶ 33. "No additional consequences need be pleaded or proved." *Id.*

¶ 37 We also take guidance from our recent decision in *Rylatt v. Christensen*, 2025 IL App (4th) 240032-U. There, four plaintiffs tried to appeal a decision by a Rockford zoning officer finding a new "Rockford Family Planning Center" exempt from certain zoning requirements. The Zoning Board of Appeals found the plaintiffs lacked standing under the local ordinance, which stated, " 'An appeal to the Zoning Board of Appeals may be taken by *any person aggrieved* or by any officer, department, board or bureau of the City.' " (Emphasis added.) *Id.* ¶ 57 (quoting

Rockford Zoning Ordinance § 66-001 (eff. Apr. 3, 2008)). When reviewing this decision, we observe:

> "This ordinance mirrors section 11-13-12 of the Illinois Municipal Code (65 ILCS 5/11-13-12 (West 2022)) ('An appeal to the board of appeals by any person aggrieved or by any officer, department, board, or bureau of the municipality.'). A person's standing to appeal a zoning decision in Rockford thus turns on whether he has been 'aggrieved'—a term left undefined by the local ordinance and state statute. So we look to the common law." *Id.*

We interpreted the term "aggrieved" using Illinois case law on standing, which required that " 'the plaintiff is not merely curious or concerned about the outcome, but possesses some personal claim, status or right, a distinct and palpable injury which is fairly traceable to the defendant's conduct and substantially likely to be prevented or redressed by the grant of such relief.' " *Id.* ¶ 58 (quoting *Westwood Forum, Inc. v. City of Springfield*, 261 Ill. App. 3d 911, 921 (1994)). We determined that two of the plaintiffs had not shown "any injury to a legally cognizable interest." *Id.* ¶ 70. The remaining two plaintiffs alleged the zoning officer's determination would negatively affect their property value and quiet enjoyment of their property. *Id.* ¶ 71. We found those alleged injuries sufficient to establish standing under Illinois law and therefore sufficient to show these two plaintiffs were "aggrieved" under the zoning ordinance. *Id.* ¶ 83.

¶ 38     We interpret the zoning ordinance at issue here in light of *Rosenbach*, *Rylatt*, and Illinois common law, and we conclude that plaintiffs were "aggrieved" if the zoning officers' decisions injured their rights or legally cognizable interests. See *Rosenbach*, 2019 IL 123186, ¶ 29; see also *Rylatt*, 2025 IL App (4th) 240032-U, ¶ 70.

¶ 39     Plaintiffs claim that they "qualify as aggrieved parties because they suffer[ed]

cognizable injuries to their aesthetic interests, associational interests, and organizational missions." That is, plaintiffs claim they are "aggrieved" based on the same injuries they relied on for their mandamus claim in count II. If plaintiffs suffered such an injury, then they were "aggrieved" persons entitled to appeal the TUPs, and the Zoning Board further injured them if it failed to respect their appeal rights. If, however, plaintiffs were not "aggrieved," they had no right to appeal the TUPs, and the Zoning Board did not injure them by refusing to allow their appeal.

¶ 40        This leaves us to consider whether plaintiffs suffered any injury to a "legally cognizable interest" that could both qualify them as "aggrieved," with a right to appeal the TUPs, as asserted in counts I, III, and IV, and provide standing to file their claim in count II with the trial court.

¶ 41                                    B. Aesthetic Injury

¶ 42        First, plaintiffs allege that Hindi suffered "aesthetic injury." According to the amended complaint, Hindi has spent many hours personally advocating for the animals at the Boone County events, and he "is deeply affected by the animal cruelty he witnesses" there. He likens the "physical manifestations of the emotional distress" he experienced to post-traumatic stress disorder. He has "been hospitalized due to the stress and frustration resulting from witnessing animal cruelty at *La Charreada* events."

¶ 43        Plaintiffs rely on a series of federal cases to show that "aesthetic injury" based on cruelty to animals can confer standing. In *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972), the United States Supreme Court reasoned, "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." In *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 563 (1992), the Court found that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." Plaintiffs particularly highlight *Animal Legal Defense Fund v. Glickman*, 154 F.3d 426 (1998). There, the plaintiffs alleged they suffered aesthetic injury after viewing primates living in inhumane conditions. *Id.* at 431-32. Based on this injury, the federal circuit court of appeals found the plaintiffs had standing to challenge the Department of Agriculture's regulations permitting those conditions. *Id.* at 432-437.

¶ 44          Although Illinois courts "tend to find federal law persuasive on the issue of standing, we are not bound to follow it." *Grassroots Collaborative*, 2020 IL App (1st) 192099, ¶ 23; see *Greer*, 122 Ill. 2d at 574. Unlike federal courts, Illinois courts have not found "aesthetic injury" sufficient for standing. In *Landmarks Preservation Council of Illinois v. City of Chicago*, 125 Ill. 2d 164 (1988), three organizations dedicated to preserving and appreciating significant architecture sued the City of Chicago, challenging the City of Chicago's efforts to decertify the façades of the McCarthy Building as a landmark. The trial court dismissed the complaint, and the supreme court affirmed. It found that at least two of the organizations' "only interest appears to be the ability to view this private property from a public street." *Id.* at 175. These organizations did not suffer an injury to any legally cognizable interest because "aesthetic interests, while not to be disregarded, are not controlling on the question of standing." *Id.*; see *Harris Trust & Savings Bank v. Duggan*, 95 Ill. 2d 516, 525 (1983); see also *Penrod Premium Consignment Cigars Ltd. v. City of Chicago*, 2023 IL App (1st) 221330-U, ¶ 36 (finding that a business did not have standing to challenge a landmark commission's decision permitting the construction of a screen wall on a privately owned building in a landmark district because "[t]The Illinois Supreme Court has squarely rejected appearance-based concerns as a basis for standing").

¶ 45        Our supreme court's decision in *Glisson* is also instructive. There, the City of Marion planned to construct a dam and reservoir on Sugar Creek, in Williamson and Johnson Counties. *Glisson*, 188 Ill. 2d at 214. Joseph Glisson, the plaintiff, was a "naturalist" who used Sugar Creek for " 'food gathering, recreation, spiritual, and educational activities.' " *Id.* at 217. He sued the City of Marion and its mayor, claiming that the construction would destroy the natural habitat of two endangered species, the least brook lamprey and the Indiana crayfish, and he would suffer " 'intense harm' " from the destruction of the species' habitat. *Id.* The supreme court found that Glisson lacked standing because "a party cannot gain standing merely through a self-proclaimed interest or concern about an issue, no matter how sincere." *Id.* at 231 (citing *Landmarks*, 125 Ill. 2d at 175).

¶ 46        We find plaintiffs' alleged aesthetic injury does not provide standing. *Landmarks* clearly states that aesthetic injury, alone, is not sufficient. *Landmarks*, 125 Ill. 2d at 175. Admittedly, *Landmarks* considered the plaintiffs' "aesthetic interests" in viewing a building in downtown Chicago, rather than in viewing animals free from exploitation. *Id.* Nevertheless, plaintiffs cite no contrary Illinois cases recognizing any aesthetic injury at all as a basis for standing. Furthermore, although *Glisson* does not discuss aesthetic injury, we see little difference between plaintiffs' allegations here and the alleged injury in *Glisson*. Certainly, plaintiffs here provide more specific details describing the emotional distress Hindi suffered than the *Glisson* plaintiff provided. Nevertheless, just as in *Glisson*, plaintiffs' sincere interest in or concern for animal welfare does not confer standing. See *Glisson*, 188 Ill. 2d at 231. Therefore, we find that plaintiffs' aesthetic interest is not a "legally cognizable interest." *Illinois Road. & Transportation Builders Ass'n*, 2022 IL 127126, ¶ 13.

¶ 47                         C. Associational Standing

¶ 48 Plaintiffs next rely on associational standing. Through the doctrine of associational standing, "an organization may assert the legal rights of its members in certain circumstances." *Winnebago County Citizens for Controlled Growth v. County of Winnebago*, 383 Ill. App. 3d 735, 740 (2008). An organization has associational standing if " '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " *International Union of Operating Engineers, Local 148, AFL-CIO v. Illinois Department of Employment Security*, 215 Ill. 2d 37, 47 (2005) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

¶ 49 To show that their "members would otherwise have standing to sue in their own right," HFA and SHARK rely on the "intense emotional and aesthetic injury" suffered by their members, including Hindi, resulting from the cruel treatment of animals at *charreadas*. In addition to the allegations of Hindi's distress, the amended complaint alleges that HFA's and SHARK's other members and staff also "have a deep respect for animals," and "seeing animals suffer at *La Charreada* events, repeatedly, has a profound emotional impact." Their members are further distressed by defendants' issuance of TUPs and refusal to hear their appeals of those TUPs.

¶ 50 As indicated above, under Illinois law, aesthetic interests are not "legally cognizable" for standing. Nor is sincere concern for an issue. See *Glisson*, 188 Ill. 2d at 231. Because Illinois law does not recognize these alleged injuries, plaintiffs also have not established that their individual members were "aggrieved" under the zoning ordinance, so they had no right to appeal the zoning officer's decisions to the Zoning Board. HFA and SHARK have not shown that their individual members have standing to sue in their own right, so their associational standing claim fails.

¶ 51                        D. Organizational Standing

¶ 52          Finally, HFA and SHARK rely on organizational standing. They allege that they suffered distinct injuries as organizations, apart from any harm to their individual members. Specifically, they allege they expended resources investigating *charreadas* that received TUPs and challenging defendants' issuance of those TUPs. For example, they sent people and drones to observe *charreadas* and document the treatment of animals there. They further allege that defendants' conduct caused them to narrow their focus, preventing them from deploying resources, like personnel and drones, to advance their core mission. But for defendants' actions, HFA and SHARK would have "direct[ed] services toward providing care and sanctuary to farmed animals, conducting anti-cruelty investigations, and crafting legislation to halt cruelty in the farming industry, rather than devoting significant time and energy to this one county in Illinois."

¶ 53          The foundational federal case for organizational standing is *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). There, Housing Opportunities Made Equal (HOME), an organization whose "activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination," sued Havens Realty Corp. (Havens), the owner of two apartment complexes, and an employee of Havens. *Id.* at 368. HOME alleged that Havens violated the federal Fair Housing Act (42 U.S.C. § 3604 *et seq.* (1976)) by falsely telling Black applicants that they had no available apartments. *Havens*, 455 U.S. at 368. HOME alleged, " 'Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices.' " *Id.* at 379. The United States Supreme Court found this sufficient for standing, reasoning:

"If, as broadly alleged, [Havens's] steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

¶ 54 Recently, the Court clarified *Havens*. In *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), pro-life doctors and medical associations sued the federal Food and Drug Administration (FDA), challenging changes to FDA regulations that made the abortion drug mifepristone easier to obtain. The associations claimed they had "standing not based on their mere disagreement with FDA's policies, but based on their incurring costs to oppose FDA's actions." *Id.* at 394. These costs included conducting their own studies on mifepristone, drafting citizen petitions to the FDA, and other advocacy efforts. *Id.*

¶ 55 The Court held that the medical associations had not alleged sufficient injury to confer standing. It reasoned that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Id.* The Court clarified that, under *Havens*, a plaintiff's diversion of resources in response to the defendant's actions is not sufficient injury for standing. *Id.* at 395. Instead, in *Havens*, "[c]ritically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* Because Havens's illegal racial steering impaired HOME's counseling and referral services, "Havens's actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling

- 19 -

defective goods to the retailer." *Id.* The Court cautioned, "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *Id.* at 396.

¶ 56 As stated above, Illinois courts treat federal precedents on standing as merely persuasive, not controlling. See *Grassroots Collaborative*, 2020 IL App (1st) 192099, ¶ 23. Few Illinois cases have directly addressed *Havens* and organizational standing, but *Grassroots Collaborative* is a notable exception. There, two nonprofit organizations sued the City of Chicago, claiming that the City of Chicago administered its tax policies in a racially and ethnically discriminatory way by illegally directing funds to predominately White neighborhoods and depriving predominately Black and Hispanic neighborhoods of the opportunity for economic development. *Id.* ¶¶ 5-7. In response to the City of Chicago's policy, the nonprofit organizations prepared a report on the policy, organized various community events, presented testimony at Chicago Board of Education meetings, and engaged in other advocacy efforts, at the expense of other projects. *Id.* ¶¶ 13-14. They claimed "the frustration of their missions and diversion of their resources to counteract that frustration" were injuries to their legally cognizable interests. *Id.* ¶ 16.

¶ 57 The trial court dismissed their complaint for lack of standing, and the appellate court affirmed. The appellate court found that "frustration of mission and diversion of resources" did not constitute injuries sufficient for standing. *Id.* ¶ 25. Interpreting *Havens*, the appellate court reasoned:

> "[A]n organization is injured for purposes of standing when the provision of its services or the performance of its activities is impaired by the defendant's actions. Although the drain on or diversion of resources that may accompany that impairment might compose a portion of the organization's injury, we see no basis in *Havens* to conclude that it alone qualifies as an injury sufficient to confer

standing on an organization." *Id.* ¶ 28.

The court found that the plaintiffs "made no allegations that they have suffered any impairment to the provision of their services or the performance of their daily operations." *Id.* ¶ 32. Even if the City of Chicago's conduct caused the plaintiffs to shift the target of their advocacy efforts, "the fact that plaintiffs reallocated their resources to counter the effects of the City of Chicago's actions does not represent a palpable and distinct injury." *Id.* ¶ 36.

¶ 58     Considering *Havens*, *Alliance*, and *Grassroots Collaborative*, we find that plaintiffs have not alleged sufficient injury for organizational standing. Because their work consists of investigating, litigating, and "crafting legislation" to prevent cruelty to animals, HFA's and SHARK's activities are more similar to the "issue-advocacy" in *Alliance* than the referrals and counseling in *Havens*. See *Alliance*, 602 U.S. at 396. Frustration of their advocacy efforts does not constitute an injury. See *Grassroots Collaborative*, 2020 IL App (1st) 192099, ¶ 25.

¶ 59     Indeed, HFA and SHARK have not alleged that defendants impaired their "services" or their daily operations. See *id.* ¶ 28. Although HFA and SHARK have cursorily alleged that they provide direct care for animals, they have not connected that care to Boone County's zoning ordinances or *charreadas*, except by alleging they diverted resources from their care for other animals to their advocacy efforts at issue here. They have not alleged, for example, that they provide emergency veterinary care for animals in Boone County, and this service is burdened by widespread animal abuse at events authorized by TUPs. Instead, they allege only that defendants caused them to devote more resources to issue-advocacy in Boone County instead of engaging in other activities.

¶ 60     This diversion of resources does not confer standing. See *id.* As the United States Supreme Court said in *Alliance*, an organization cannot acquire standing "simply by expending

money to gather information and advocate against the defendant's action." See *Alliance*, 602 U.S. at 394.

¶ 61 Plaintiffs cite *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019). There, the Indiana legislature passed Senate Enrolled Act 442 (Act 442) (2017 Ind. Acts 280 (eff. July 1, 2017) (amending Ind. Code § 3-7-38.2-5(d)-(e)), a statute aimed at purging the state's voter rolls of individuals suspected of being ineligible to vote. *Common Cause*, 937 F.3d at 948. Three "voter-advocacy organizations" sued, arguing that Act 442 violated the National Voter Registration Act (52 U.S.C. §§ 20501-11 (West 2018)). *Common Cause*, 937 F.3d at 949. Two federal district courts granted the organizations preliminary injunctions that stopped Act 442 from taking effect. *Id.* In upholding the injunctions, the Seventh Circuit Court of Appeals found that the plaintiffs had sufficiently alleged organizational standing. The court explained that each of the plaintiff organizations "advocates for voter access, conducts voter education to promote voter access, helps voters overcome any challenges they face trying to vote, and helps voters register to vote (or re-register if needed)." *Id.* at 951. The court reasoned that if Act 442 took effect, the organizations would

> "be required to increase the time or funds (or both) spent on certain activities to alleviate potentially harmful effects of Act 442, such as voter confusion, erroneous registration removal, and chaos at the polling place; and their missions will be thwarted, because even with those extra efforts, confusion around Act 442 and the need to combat it will displace other projects they normally undertake." *Id.* at 952.

¶ 62 The defendant argued that Act 442 simply prompted the plaintiffs to do the same kind of work they normally did, and this was not sufficient injury for standing. *Id.* at 953. The court rejected this argument. First, the court found that Act 442 caused the organizations to

"undertake the extra efforts they describe and cease other activities. By adding to their workload, Act 442 costs them time and money they would have spent differently or not spent at all." *Id.* at 954. Second, the court reasoned that although an organization "cannot convert[ ] ordinary program costs into an injury in fact," an organization has suffered an injury if the challenged conduct imposed additional or new burdens, the disruption to the organization was real, and its response was warranted. *Id.* at 955 (quoting *National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)). Finally, the court reasoned that Act 442 caused the injury, even if the plaintiffs chose how to allocate their resources, because the organizations' actions "were undertaken because of the challenged law." *Id.* at 956.

¶ 63        The court acknowledged that "abstract disagreement" with a public policy was not an injury. *Id.* It explained:

> "We have no problem ruling out standing for lobbying efforts in Indiana's legislature, but that is not the activity on which the Organizations are relying. In 'helping others contend' with or prepare for Act 442, the Organizations perform concrete work, voter-by-voter, polling place by polling place. Act 442 created the problem, and so causation exists." *Id.*

Because the injunctions would counteract the problem that necessitated this work, the organizations had standing to sue. *Id.*

¶ 64        *Common Cause* does not change our analysis. First, as a federal case, *Common Cause* is not controlling here. See *Grassroots Collaborative*, 2020 IL App (1st) 192099, ¶ 23. Second, the *Common Cause* court focused on the organizations' work " 'helping others contend' with or prepare for Act 442." *Common Cause*, 937 F.3d at 956. By, for example, helping to reregister voters wrongfully removed from the voter rolls, the *Common Cause* plaintiffs

provided a discrete service to individual clients, like the counseling and referral services in *Havens*, and this service was distinct from any policy advocacy. HFA and SHARK do not allege they provided any clients with any services that helped them contend with the TUPs or *charreadas*. Although they advocated for the well-being of the animals at the Boone County events, this advocacy is more comparable to the lobbying efforts that *Common Cause* found were insufficient for standing than to the voter registration work. See *id.* Finally, to the extent that plaintiffs cite *Common Cause* to show that diversion of resources is a basis for standing, we note that *Common Cause* predates *Alliance*, which clearly rejected diversion of resources as an injury that confers standing. See *Alliance*, 602 U.S. at 395.

¶ 65        Even if HFA and SHARK diverted resources away from other work to their advocacy against the *charreadas* and defendants' zoning decisions, we hold this diversion of resources does not constitute organizational injury.

¶ 66        Plaintiffs' claims of aesthetic injury, associational standing, and organizational standing fail. Therefore, they were not "aggrieved" persons under Boone County's zoning ordinances, and they had no right to appeal the zoning officer's decisions. Plaintiffs have not alleged any injury to a legally cognizable interest, so they lack standing. See *Illinois Road & Transportation Builders Ass'n*, 2022 IL 127126, ¶ 12. Accordingly, we affirm the trial court's dismissal of the amended complaint.

¶ 67                                    III. CONCLUSION

¶ 68        For the reasons stated, we affirm the trial court's judgment.

¶ 69        Affirmed.